COMMISSIONER OF INTERNAL REVENUE, Petitioner,

v.

VALLEY MORRIS PLAN, formerly The Stockton Morris Plan Company, Respondent.

COMMISSIONER OF INTERNAL REVENUE, Petitioner,

v.

The MORRIS PLAN COMPANY OF CALIFORNIA, Respondent.

Nos. 17016, 17135.

United States Court of Appeals
Ninth Circuit.

May 22, 1962.

As Amended on Denial of Rehearing
June 29, 1962.

Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, Joseph Kovner, Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, Joseph Kovner, Atty. Dept. Justice, Washington, D. C., for petitioner.

Harold J. Willis, Stockton, Cal., for respondent, Valley Morris Plan.

F. Daniel Frost, John J. Waller, Gibson, Dunn & Crutcher, Los Angeles, Cal., for respondent, Morris Plan Co.

Before HAMLIN and MERRILL, Circuit Judges, and FOLEY, District Judge.

FOLEY, District Judge.

We have before us two separate petitions to review two decisions of the Tax Court of the United States. With one exception, an identical question was involved and while the cases were briefed separately, they were united for argument. We will endeavor to dispose of them in a single opinion.

The exception is the alternative issue raised in the Morris Plan Company of California case.

Jurisdiction is conferred by § 7482 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 7482.

The identical question presented in each of the cases as it appears in the briefs of the Commissioner of Internal Revenue is:

"Whether the Tax Court erred in holding that thrift certificates representing sums placed in a Morris Plan Company are certificates of indebtedness and thus includable in borrowed capital for excess profits tax purposes within the meaning of Section 439(b) (1) of the Internal Revenue Code of 1939."

The Valley Morris Plan case involves the same question:

"Did the Tax Court correctly hold that the indebtedness of the respondent California industrial loan company evidenced by its outstanding Term Thrift Certificates was allowable as borrowed capital in computing its excess profits credit * * *?"

The same question was referred to in the brief of the Morris Plan Company of California as follows:

"Whether the Tax Court correctly held that the indebtedness of Respondent California industrial loan company evidenced by its outstanding thrift certificates constituted 'borrowed capital' within the meaning of Section 439(b) (1) of the Internal Revenue Code of 1939, as amended."

So we have in each case as the first issue to be determined substantially the same question.

As noted by the petitioner, there is a difference of fact. In Valley Morris Plan Term Thrift Certificates are involved, while in the California Morris Plan case we are, in the main, concerned with Installment Thrift Certificates. From our review of the cited cases we feel that this difference is of no consequence.

As explanatory of the matters which are involved in both cases, we refer to the statement of petitioner in Valley Morris that:

"This case draws in question the meaning of certain terms used in Section 439(b) (1) of the Internal Revenue Code of 1939, and Section 40.439–1(f) of Treasury Regulations 130, issued thereunder. Section 439 was enacted by Section 101 of the Excess Profits Tax Act of 1950, which added a new Subchapter D to Chapter 1, 26 U.S.C.A. Excess Profits Taxes, § 430 et seq., the income tax chapter, of the Internal Revenue Code of 1939, to provide additional income taxes on excess profits of corporations. Generally speaking, excess profits are measured by an excess over a 'credit' representing normal profits. * * *

"We are concerned here with the excess profits tax credit based on invested capital, as indicated by Section 436 and related sections. Section 437(b) defines the elements of invested capital to include 'equity capital' and '75 percentum of the

average borrowed capital for the taxable year computed under Section 439(a).' Equity capital is in general the total of assets less liabilities. Section 437(c). Section 439(a) defines average borrowed capital in terms of daily borrowed capital and subsection 439(b) (1) defines daily borrowed capital * * *."

Section 439(b) (1) of the Excess Profits Tax Act of 1950 is:

"§ 439. Borrowed capital.

"(a) * * *

"(b) Daily borrowed capital. For the purposes of this subchapter, the daily borrowed capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following:

"(1) The amount of the outstanding indebtedness (not including interest) of the taxpayer, incurred in good faith for the purposes of the business, which is evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, deed of trust, bank loan agreement, or conditional sales contract. In the case of property of the taxpayer subject to a mortgage or other lien, the amount of indebtedness secured by such mortgage or lien shall be considered as an indebtedness of the taxpayer whether or not the taxpayer assumed or agreed to pay such indebtedness, plus * * *."

Treasury Regulation 130, § 40.439–1 (f), defining the term "certificate of indebtedness" is the following:

"(f) The term 'certificate of indebtedness' includes only instruments having the general character of investment securities issued by a corporation as distinguishable from instruments evidencing debts arising in ordinary transactions between individuals. The term 'conditional sales contract' means a contract corresponding to a mortgage except that the transfer of title is made dependent upon the payment of the stipulated price. Borrowed capital does not include indebtedness incurred by a bank arising out of the receipt of a deposit and evidenced, for example by a certificate of deposit, a passbook, a cashier's check, or a certified check, and the term 'bank loan agreement' does not include the indebtedness of a bank to a depositor."

The decision of the Tax Court in Valley Morris was:

"Ordered and Decided that there is no deficiency or overpayment in income and excess profits taxes for the year 1951, there is a deficiency in income and excess profits taxes for the year 1952 in the amount of $1,494.40, and there is an overpayment in income and excess profits taxes for the year 1953 in the amount of $157.30, which amount was paid within three years before the mailing of the notice of deficiency, which notice of deficiency was mailed within three years from the time the return was filed by the taxpayer."

In its opinion the Tax Court stated:

"The only issue for decision in this case is whether the petitioner [Valley Morris Plan, respondent here] is entitled, in computing its excess profits credit under section 439(b) (1), to include in the computation of its borrowed capital the amount of its outstanding 'Term Thrift Certificates.' It is not claiming here that the amount due on its 'Installment Thrift Certificates' should be included in the computation of its borrowed capital. It states that no excess profits taxes will be due if its outstanding indebtedness on its Term Thrift Certificates is included in the computation of borrowed capital."

As found by the Tax Court the "Full Paid Term Thrift Certificates" for the periods here in question were issued on

printed forms in denominations of $500 and $1,000. The front side of a $1,000 certificate is as follows:

"[Term Thrift Certificate—front]

TERM THRIFT CERTIFICATE

Number      Face Amount

"T                $1000

[Crest]

"hereinafter called 'Company,' certifies that

and/or

is the Registered Owner, hereinafter called 'Owner,' of this Term Thrift Certificate, which is payable according to the following terms and conditions:

"A. Payment shall be made to Owner at the current Redemption Value as shown on the Table of Redemption Values hereon, upon presentation of this Certificate, properly endorsed, at the office of Company in the City of Stockton, State of California.

"B. Company shall pay, upon request to the personal representative of the estate of Owner, in the event of his death prior to the Maturity Date hereof, the Face Amount together with interest from the date prior to the Maturity Date hereof, the Face Amount together with interest from the date hereof at the rate of four (4%) per cent per annum compounded semi-annually in lieu of the current Redemption Value.

"C. Company shall pay to owner, upon the maturity of this Certificate the excess of the then current Redemption Value over the Face Amount hereof. Thereupon, the Certificate shall be automatically renewed for a six (6) month period from its Maturity Date. Company shall pay Interest upon the Face Amount at the rate of four (4%) per cent per annum to Owner at the new Maturity Date; and, thereupon, this Certificate shall be automatically renewed for an additional six (6) month period. Such payments of interest and renewals shall continue until this certificate shall be presented for payment. If payment be made at any time other than Maturity Date, Company shall not be obligated to pay any interest for the current six (6) month period.

"D. Company may, at its option, (a) require thirty (30) days Notice of request for payment in writing; and (b) limit the aggregate amount of payments for redemption of its Thrift Certificates of all classes in any one calendar month to an amount not exceeding its net receipts in the previous calendar month, and, in this case, Certificates shall be paid in the order in which they are presented therefor. Notwithstanding the foregoing, the entire amount payable hereunder together with accrued Interest at the rate of four (4%) per cent per annum compounded semi-annually shall be payable not later than six (6) months from the date of the giving of said Notice of request for payment.

"E. This Certificate may be registered in the names of two or more persons, or the survivor or survivors thereof. In this event, payment of the Face Amount or Interest to any one of said persons is in full discharge of Company's liability hereon in the amount so paid.

"F. Company may redeem this Certificate at any time by paying the Face Amount together with Interest from the date hereof at the rate of four (4%) per cent per annum compounded semi-annually unto Owner, provided Company gives unto Owner a notice of its intention so to do. Said notice must fix a definite date of payment which shall be not less than thirty (30) days nor more than sixty (60) days from date of delivery of same. Company shall not be obligated to pay any interest after the date of said redemption so fixed.

"Said notice shall be deemed delivered when deposited in the United States Post Office, at Stockton, California, enclosed in an envelope addressed to Owner at his last known address as given by him unto Company, with postage prepaid.

"G. This Certificate is registered in books kept at the office of Company and is transferable only upon its presentation at said office with a written form of assignment acceptable and delivered to Company duly executed by the person appearing to be the Owner hereof.

"H. In the event of the loss of this Certificate and upon proof thereof in a manner satisfactory to Company, Company may issue unto Owner a new Certificate identical with this in form; or, at the option of Company, Owner may be required to follow the requirements of the Statutes of the State of California then in force relating to lost documents.

"In Witness Whereof, Valley Morris Plan has caused this Certificate to be signed by its duly authorized officers and its corporate seal affixed this...... day of ...... 19....
    Valley Morris Plan
"Maturity Date:
......day of...... ......, 19...
    ..............

"THIS IS NOT A CERTIFICATE OF DEPOSIT
    *  *  *"

Among others, the following claimed errors are assigned:

"The Tax Court erred:

"1. In holding and deciding that taxpayer's [respondent's] obligations evidenced by its term 'thrift and installment thrift certificates' constitute borrowed capital within the meaning of Section 439 of the Internal Revenue Code of 1939 (as amended by Section 101 of the Excess Profits Tax Act of 1950).
    *  *  *

"3. In holding and finding that the taxpayer was not a 'bank' [for the purposes of the Excess Profits Tax Act of 1950].

"4. In failing to hold and find that the taxpayer was engaged in activities of a bank and was such for federal income tax purposes."
Petitioner argues that:

"The Tax Court erred in holding that the Thrift Certificates of a Morris Plan Company represent borrowed capital in the form of certificates of indebtedness of a corporation within the meaning of Section 439(b) (1) of the Revenue Act of 1939."

That the Tax Court so held appears from the following excerpts of Judge Murdock's opinion:

"Section 439 of the Internal Revenue Code of 1939 was added by section 101 of the Excess Profits Tax Act of 1950 and applies to all taxable years ending after June 30, 1950.
*  *  *

"The only issue for decision in this case is whether the petitioner [respondent here] is entitled, in computing its excess profits credit under section 439(b) (1), to include in the computation of its borrowed capital the amount of its outstanding 'Term Thrift Certificates'. It is not claiming here that the amount due on its 'Installment Thrift Certificates' should be included in the computation of its borrowed capital. It states that no excess profits taxes will be due if its outstanding indebtedness on its Term Thrift Certificates is included in the computation of borrowed capital.

"The petitioner's [respondent's here] indebtedness on the Term Thrift Certificates was incurred in good faith for the purpose of its business, and the question is whether it was 'evidenced' by one of the items mentioned in the above quoted portion of section 439(b) (1). This question narrows under the argu-

ments of the parties to whether the Term Thrift Certificate might fairly be regarded as a 'certificate of indebtedness' within the meaning of the section.

"The Commissioner has provided in Regs. 130, Section 40.439–1(e) and (f) that—

" * * * The name borne by the certificate is of little importance. More important attributes to be considered are whether or not there is a maturity date, the source of payment of any 'interest' or 'dividend' specified in the certificate (whether only out of earnings or out of capital and earnings), rights to enforce payment, and other rights as compared with those of general creditors.

"The term 'certificate of indebtedness' includes only instruments having the general character of investment securities issued by a corporation as distinguishable from instruments evidencing debts arising in ordinary transactions between individuals. * * * Borrowed capital does not include indebtedness incurred by a bank arising out of the receipt of a deposit and evidenced, for example, by a certificate of deposit, a passbook, a cashier's check, or a certified check, and the term 'bank loan agreement' does not include the indebtedness of a bank to a depositor.

"The petitioner was not a bank and was prohibited from receiving deposits. Its Term Thrift Certificates were not certificates of deposit. Those certificates have a maturity date, usually three years after issuance. The interest specified in the certificate was to be paid in any event and was not limited to payment out of earnings. The certificates were not 'instruments evidencing debts arising in ordinary transaction between individuals' but were distinguishable from such instruments in much the same ways as are 'instruments having the gen-

eral character of investment securities issued by a corporation.' They were issued by a corporation under express authority of the Department of Investment. They represented investments by the holders of the certificates. They were similar in many respects to the types of evidences of indebtedness listed in section 439(b)(1). It is difficult to exclude these certificates from borrowed capital under section 439(b) (1) even under the Commissioner's regulations, although their payment was not secured by a lien on any particular property of the petitioner or by any designated cash reserve but was payable generally from the funds of the petitioner."

In Commissioner of Internal Revenue v. Ames Trust & Savings Bank, 8 Cir., 185 F.2d 47, 48, the Court said:

"[1] The Tax Court regarded a time certificate of deposit as constituting a certificate of indebtedness within the meaning of the statute and also said that it had the general character of an investment security required by the regulation. 12 T.C. [770,] pages 772, 773. In order, however, to escape the effect of the express provision of the regulation that 'Borrowed capital does not include indebtedness incurred by a bank arising out of the receipt of a deposit and evidenced, for example by a certificate of deposit, a passbook, a cashier's check, or a certified check,' the Tax Court declared that 'Under the principle of noscitur a sociis [it is known from its associates] the association of certificates of deposit with passbooks and checks satisfies us that what was referred to was a certificate of demand deposit.'

"This seems to us in the circumstances a strained search for meaning and an artificial construction of the regulation. The regulation makes the clear and substantive prescription that 'Borrowed capital does not include indebtedness incur-

red by a bank arising out of the receipt of a deposit * * *.' It then sets out some of the forms in which deposit transactions may be clothed or 'evidenced,' such as certificates of deposit, passbooks, cashier's checks and certified checks, for the purpose, as we think apparent on its face, of simply emphasizing that, even though so clothed, deposit transactions cannot be regarded as borrowed capital. The enumerated forms are given merely in illustration, as the language 'for example' directly indicates.

"On all of this, we can see no basis in interpretive function for saying that the term 'a certificate of deposit' must be construed to not have its full and natural scope in the regulation and that the general substantive prescription of the regulation, that the deposit liabilities of a bank cannot be classed as borrowed capital, should correspondingly be curbed and be held to be intended to have application only to demand deposits.

"[2] Nor is the distinction which the Tax Court made between time certificates and demand certificates as reflecting obligations of different type or effect one that has any other recognized basis of support, either in banking law or banking concept. Legally, deposits on time certificates constitute a part of the deposit liability of a bank, just as much as those on demand certificates or in general checking accounts, and are regulated as such. Thus, for example, the Iowa statutes fix reserves for both the time and demand deposits of a state bank. Code of Iowa 1946, § 528.69, I.C.A. And in business operation, time certificates equally with demand certificates are carried on the books and statements of a bank as deposit liabilities, in distinction from borrowings and other obligations—just as the record shows, from the reports of the bank to the Federal Reserve Bank, had been done here.

Also, such certificates of a bank are treated the same as its demand certificates are, for purposes of deposit protection by the Federal Deposit Insurance Corporation, 12 U.S.C.A. § 264(c) (12), of which this bank was a member.

"[3] Hence, neither on the language of the regulation nor as a matter of legal status or banking concept, are we able to see any basis for construing the regulation as the Tax Court did. The only question therefore that could possibly exist in the situation is whether the regulation, in providing that the deposit transactions of a bank, even though represented by certificates of deposit, do not constitute a borrowed-capital indebtedness, is violative of the statute and so is invalid. We do not believe that the regulation is out of harmony with the statute.

\*   \*   \*   \*   \*   \*

"[5] Historically and recognizedly, bank deposits have never been regarded as representing 'borrowed capital,' within the commercial connotation of that term. As the Iowa Supreme Court said in Elliott v. Capital City State Bank, 128 Iowa 275, 276, 103 N.W. 777, 778, [1 L.R.A.,N.S., 1130,] the term 'deposit' always has had a meaning of its own, 'peculiar to the banking business, and one that the courts should recognize and deal with according to commercial usage and understanding.' And such a transaction is without any of the characteristics of money borrowing. Certainly there is no intent on the part of an ordinary depositor to make a general loan to the bank. Nor is a bank permitted to deal with deposits as general loans, for the law, through legislative or administrative regulation, imposes limitations upon the manner and extent of the use of such funds, different from those on capital investment or borrowings. Also, as we have indicated, the distinction between de-

posit liabilities and other indebtedness is recognized by the banks themselves in their records and operations.

"That this inherent and established distinction between deposit liability and commercial indebtedness, which has been carried into the regulation, was intended to exist under the statute would seem furthermore to be pointed to by the joint hearings upon the bill. A representative of the American Bankers Association sought to have the bill provide that deposit liabilities should constitute borrowed capital, but members of the Committee voiced disagreement with his attempted analogy between deposits and borrowings, and the Committee did not approve any such change. * * *

"[6, 7] * * * We should perhaps add that we do not consider Economy Savings & Loan Co. v. Commissioner, 5 T.C. 543, affirmed on other grounds, 6 Cir., 158 F.2d 472, cited by the Tax Court and relied upon by the bank here, as being in any way applicable to the present situation. Under the contract governing the dealings of the parties, the funds received by the loan company in that case were not of the nature of a deposit transaction with a bank, as the court itself there recognized, in saying that 'Respondent's suggestion that petitioner was really in the banking business and that the funds evidenced by the certificates herein involved are analogous to the deposits of a bank is not borne out by the evidence.' "

It will be noted that in the Iowa case, Elliott v. Capital City State Bank, cited above, it was held that the bank deposits were transactions without any of the characteristics of money borrowing, there being no intent on the part of an ordinary depositor to make a general loan to the bank. Was the purchase of one of respondent's thrift certificates a transaction having any of the character-

istics of money borrowing, and was there any intent on the part of purchasers of respondent's thrift certificates to make a general loan to respondent? If not, it seems illogical to hold that money received from the sale of such thrift certificates should be considered as borrowed capital for the purposes of the business. If there was such an intent on the part of purchasers of thrift certificates, and if the thrift certificates were purchased with the idea in the mind of the purchasers to loan money to respondent for the purposes of respondent's business, it seems fair to say that it would have been an easy matter for respondent to produce at the hearings before the Tax Court the testimony of purchasers of thrift certificates to that effect. From the fact that a search of this record discloses no such testimony, it may be inferred that no witness could have been found who would testify that it was his intent in the purchase of a thrift certificate to loan money to respondent "in good faith for the purposes of the business" of respondent.

There is no testimony in the record from any of the purchasers of Term Thrift Certificates as to an intention to make a loan for the purposes of the business to respondent and we have failed to find any other testimony or evidence of such an intention. The certificates themselves, as shown by the form thereof included in the findings, disclose no purpose or intent of the purchasers to make a loan at the request of respondent for purposes of respondent's business.

What we have just above said as to the intention of purchasers of thrift certificates is applicable to the Morris Plan Company of California case, there being no evidence in the record in that case as to an intention of any purchaser of an Installment Thrift Certificate to make a loan for the purposes of the business.

We should keep in mind the manner in which thrift certificates are acquired by purchasers or owners. Respondent, after having acquired a permit from the state authority, advertises to the public that it has certificates for sale. On their

face the forms of thrift certificates indicate the rate of interest to be paid to a purchaser of such certificates. In response to such advertising a person desiring to obtain a Term Thrift Certificate comes to the respondent's place of business, states the amount desired and the name or names in which he desires a certificate or certificates issued and delivers cash to the respondent equal to the face amount of the certificates issued. This is an accurate description of the entire transaction between respondent and a purchaser of respondent's thrift certificates. Such a transaction is nothing more nor less than a deposit transaction, the money to be kept safely for the purchaser and to be repaid according to the terms of the certificate with interest.

It seems obvious that something more would be required to render such a transaction a loan to respondent for the purposes of respondent's business. The usual definition and understanding of what constitutes a loan is stated by the District Judge in National Bank of Paulding v. Fidelity & Casualty Company and Maryland Casualty Company, D.C., 131 F.Supp. 121, 123. There Judge Cecil stated:

"[1, 2] In order to have a loan, there must be an agreement, either expressed or implied, whereby one person advances money to the other and the other agrees to repay it upon such terms as to time and rate of interest, or without interest, as the parties may agree. In order to have a contract, there must be a meeting of minds."

This record does not disclose any agreement on the part of any purchaser of a thrift certificate to loan monies to respondent for the purposes of its business. The thrift certificate, by its terms, does not authorize respondent to use any of the money received from the sale thereof for any other purpose or in any other manner than banks apply and use money received in deposits.

The monies received from the sale of thrift certificates were used in the same manner as banks use monies received in deposits. That this is true appears from the following testimony of Mr. Edwin B. Fuld, Valley Morris' president. He testified in response to a question on direct examination as follows:

"Q. * * * In what manner does your company use the money that is obtained from the certificates?

"A. The money is used in the transaction of our business.

"Q. Which is what?

"A. The business is two-fold: The making of loans and the purchasing of paper, of notes, conditional sales contracts, and other evidences of indebtedness.

"Q. What other money is so used besides the amount you receive from the sales of certificates?

"A. Our capital is used, and also bank loans."

Evidently on this testimony the Tax Court made its finding that:

"The money obtained by the petitioner on the issuance of certificates is used in its business in making loans and purchasing paper, notes, conditional sales contracts and other evidence of indebtedness. The only other money which the petitioner has available for business purposes is capital and money borrowed from banks."

Banks engage in the same business which we are informed by Mr. Fuld that the respondent is engaged in and they use depositors' money for the same purposes respondent uses the money derived from the sale of thrift certificates. And it should be noted that Mr. Fuld also testified that his institution competes with banks.

The respondent has failed to meet its burden of proof to establish that the money received from the sale of thrift certificates was borrowed for the purposes of the business.

The state law under which respondent was organized forbids it to accept deposits and at the conclusion of the form

of the thrift certificate, in oversized capitals, appears the statement, "THIS IS NOT A CERTIFICATE OF DEPOSIT."

We have seen that the Tax Court found:

> "\* \* \* It [respondent] was not a state or national bank."

and that

> "\* \* \* [t]he petitioner has never represented itself as a bank, has never accepted deposits, does not issue certificates of deposit and is prohibited by law from issuing certificates of deposit."

The Term Thrift Certificates issued by respondent, regardless of the oversized letters to the contrary, qualify as certificates of deposit.

Respondent must concede that a substantial part of its business was the advertising and selling to the public of thrift certificates. The money so received from thrift certificates did not constitute money borrowed for the purposes of respondent's business and the payments of money for which respondent issued its thrift certificates, either Term or Installment, were deposits.

As we have seen, Treasury Regulation 130, § 40.439–1(f) provides that:

> "\* \* \* Borrowed capital does not include indebtedness incurred by a bank arising out of the receipt of a deposit and evidence, for example, by a certificate of deposit, a passbook, a cashier's check, or a certified check, and the term 'bank loan agreement' does not include the indebtedness of a bank to a depositor."

We are not to be governed by state law in determining whether or not respondent was in fact a bank or that the monies received from thrift certificates, either Term or Installment, were deposits received by a bank.

On this subject and on other questions involved here, the Court of Appeals of the Second Circuit in Morris Plan Bank of New Haven v. Smith, Collector of Internal Revenue, 2 Cir., 125 F.2d 440, had the following to say on p. 441:

> "Sec. 104(a) of the Revenue Act of 1936 which establishes the rate of tax which the plaintiff contends should have been applied in the assessments for the years involved defines a 'bank' to which those rates shall be applied as follows: 'Definition. As used in this section the term "bank" means a bank or trust company incorporated and doing business under the laws of the United States (including laws relating to the District of Columbia), of any State, or of any Territory, a substantial part of the business of which consists of receiving deposits and making loans and discounts, or of exercising fiduciary powers similar to those permitted to national banks under section 11(k) of the Federal Reserve Act, as amended [12 U.S.C.A. § 248(k)], and which is subject by law to supervision and examination by State or Federal authority having supervision over banking institutions.'

> "The plaintiff was, during the years in question, plainly enough a bank as above defined if a substantial part of its business consisted of receiving deposits, for in other essential respects it admittedly fell within the definition. Nor was there any question but that a substantial part of its business consisted in the receipt of installment payments for which it issued the above described certificates of indebtedness which were never assigned to it as collateral security for loans. If the receipt of these payments was the receipt of deposits, therefore, the plaintiff was a bank as defined.

> "[1] If the state law were decisive they could not be so treated for, after the plaintiff became an industrial bank under the laws of Connecticut, it was forbidden by that law to receive money on deposit though it was authorized by Sec. 4034 of the General Statutes of Connecticut, Revision of 1930, as amend-

ed, to sell certificates of indebtedness either fully paid or on the installment plan. But names are not what control. Morgan v. Commissioner, 309 U.S. 78, 81, 626, 60 S.Ct. 424, 84 L.Ed. 585 [1035]. Realities do. The plaintiff took these payments under agreements which made them a part of its general funds and created only the relationship of debtor and creditor between it and the payer. It issued the certificates of indebtedness in form similar to that of deposit books used by savings banks. Payments and withdrawals were entered in them and these accounts were active. * * * Whether such payments are distinguished from deposits under state law is not controlling in construing a federal taxing statute which does not expressly or by necessary implication make its application dependent upon what the law of a state may provide. Were it otherwise the varying laws of the states might well make impossible general uniformity of national taxation throughout the country. United States v. Pelzer, 312 U.S. 399, 61 S.Ct. 659, 85 L.Ed. 913.

"[2] * * * We conclude that the plaintiff is, therefore, a bank within the meaning of Sec. 104 of the Revenue Act of 1936 and entitled to be taxed accordingly. Compare, Staunton Industrial Loan Corporation v. Commissioner, 4 Cir., 120 F. 2d 930.

"Judgment reversed."

In Morgan v. Commissioner, 309 U.S. 78, 80–81, 626, 60 S.Ct. 424, cited by the Court in Morris Plan Bank of New Haven v. Smith, Collector of Internal Revenue, supra, the Supreme Court made the observation:

"State law creates legal interests and rights. The federal revenue acts designate what interest or rights, so created, shall be taxed. Our duty is to ascertain the meaning of the words used to specify the thing taxed. If it is found in a given case that an interest or right created by local law was the object intended to be taxed, the federal law must prevail no matter what name is given to the interest or right by state law."

The Supreme Court of the United States in United States v. Pelzer, 312 U.S. 399, 61 S.Ct. 659, declared that:

" * * * the revenue laws are to be construed in the light of their general purpose to establish a nationwide scheme of taxation uniform in its application. Hence their provisions are not to be taken as subject to state control or limitation unless the language or necessary implication of the section involved makes its application dependent on state law."

■ There is nothing in § 439(b) of the Excess Profits Tax Act of 1950 which requires that a different meaning be given to a bank than that defined by § 104 of the Internal Revenue Code of 1939.

In a case upon which respondent places considerable reliance, Jackson Finance & Thrift Company v. Commissioner of Internal Revenue, 10 Cir., 260 F.2d 578, at page 582, it is recognized that the definition of the term "bank" in § 104 of the Internal Revenue Code of 1939 applies to the Excess Profits Tax Act. There the Court stated:

"Sec. 438(g) of the 1939 Code relates the term 'bank' as contained in Sec. 104 of that Code, 26 U.S. C.A. (I.R.C.1939) § 104, to the excess profits tax * * *."

Sec. 438(g) of the Excess Profits Tax Act of 1950 contains the following:

"In the case of a bank (as defined in section 104), if the increase in total assets for the taxable year * * *."

Said § 104, as amended, reads:

" * * * As used in this section, the term 'banks' means a bank or trust company incorporated and doing business under the laws of the United States (including laws relat-

ing to the District of Columbia), of any State, * * *, a substantial part of the business of which consists of receiving deposits and making loans and discounts, * * * and which is subject by law to supervision and examination by State, Territorial or Federal authority having supervision over banking institutions. Such term also means a domestic building and loan association. * * *"

Section 104 also finds its way into the Excess Profits Tax Act of 1950 in § 433 (a) (1) (L):

"Bad debts in case of banks. In the case of a bank (as defined in section 104) * * *."

In Sampsell v. Straub, 9 Cir., 194 F.2d 228, 230, this Court held:

"[3] * * * Section 70, sub. c [11 U.S.C.A. § 110, sub. c] is not the only section of the Bankruptcy Act which mentions liens by legal or equitable proceedings. Identical or equivalent language appears in several sections of the Act, * * *. If there are reasons which require a certain construction of a phrase in one part of a statute, it is desirable, and presumably in accord with the intention of Congress that a similar construction be given that phrase elsewhere in the statute unless the context shows affirmatively that a different construction was intended."

The decision in the Jackson case appears to have been largely influenced by the state law of Utah. The following from the opinion, 260 F.2d 578, 581:

"[1, 2] At the time that Congress enacted the Excess Profits Tax Act of 1950 it failed to amend, revise or in any way alter the definition of borrowed capital as it was contained in the earlier World War II Act [26 U.S.C.A. Excess Profits Taxes, § 710 et seq.] except to add transactions evidenced by conditional sales contracts and bank loan agreements. At such time the ju-

dicial interpretation of the Tax Court in Economy [Economy Savings & Loan Co. v. Commissioner, 5 T.C. 543, affirmed on other grounds, 6 Cir., 158 F.2d 472], the administrative interpretation of the Treasury Department through regulation, and the formal acquiescence of the Commissioner in the holding of Economy were all part and parcel of the actual and effective administration of the earlier tax statute. The distinction between the deposit liability of a bank and the nature of a borrowing transaction such as we here consider had, in 1950, been recognized both judicially and administratively. By re-enacting the statutory definition of borrowed capital for purposes identical with that definition's original purpose it must be presumed that Congress both approved and intended to adopt the judicial and administrative interpretation and construction that had been placed upon its words by those responsible for statutory interpretation and administration. Such rule is a fundamental principle of statutory interpretation and is dispositive of the instant case unless successful contention can be made that a factual situation here exists which would put taxpayers within the rule applicable to banks. And such is the Commissioner's principal claim in argument before this Court although the Tax Court refused to pass on the merits of such contention.[4] Since the burden is upon tax-

4. "Opper, J., dissenting, stated: 'It seems to me impossible to dispose of this case on the authority of respondent's regulation without concluding that petitioner was a "bank." ' "

payers to prove that the deficiencies imposed upon them are wrong under any proper theory it is our duty to consider all contentions of the Commissioner that might sustain the contrary view. * * *

"Sec. 438(g) of the 1939 Code relates the term 'bank' as contained in

Sec. 104 of that Code, 26 U.S.C.A. (I.R.C.1939) § 104, to the excess profits tax and so defines bank thus:

"' * * *[1] a bank or trust company incorporated and doing business under the laws * * * of any State * * *, a substantial part of the business of which consists of receiving deposits and making loans and discounts * * * and which is subject by law to supervision and examination by State, Territorial or Federal authority having supervision over banking institutions.' Under the law of Utah, industrial loan companies are subject to regulation through the supervision of the State Bank Commissioner and to this extent fall clearly within the definition of a bank as defined above. AND IT WOULD BE UNREALISTIC NOT TO NOTE THE MARKED SIMILARITY IN BUSINESS PROCEDURE BETWEEN THE INTAKE OF FUNDS BY A BANK THROUGH SAVINGS DEPOSITS AND THAT OF THE TAXPAYERS THROUGH THE ISSUANCE OF THE THRIFT CERTIFICATES. [Emphasis ours] But it would be equally unrealistic not to note that such similarity is limited to form and does not exist either in law or fact. Depositors place their money in banks primarily for safekeeping, secure in the knowledge that many governmental restrictions, both state and federal, are placed upon banks to assure and sometimes, as in the case of Federal Deposit Insurance banks, to insure the safety of the deposit. 'Bank' and 'bank deposit' are terms as well known in common parlance as they are in technical commercial use. And the terms do not include industrial loan companies nor monies received by sale of thrift certificates either in actual or technical understanding. Money paid for thrift certificates (or other evidences of indebtedness whatever called) are intended as investments, influenced largely by the promise of payment of a high rate of interest, here 4%, but with a concomitant risk. Bank deposits are made at a lower rate of interest, here 2½%, for safekeeping.

"[3] To preserve both the legal and actual concept of the term 'bank' and 'bank deposit' Utah has adopted many statutory safeguards so that the issuance of thrift certificates cannot be confused with banking functions. The certificates must state on their face: 'This is not a certificate of deposit.' Industrial loan companies are prohibited from using the word 'bank' or 'bank deposit' in their business. Now 7–3–57, Utah Code Ann.1953. And they cannot accept deposits. Industrial loan companies cannot become members of the federal reserve system and are not eligible for deposit insurance with any federal agency. It seems clear that taxpayers are not banks, are not performing banking functions, and are not receiving bank deposits through the issuance of their thrift certificates. Such certificates are, and are intended to be, evidences of indebtedness to a purchaser who has invested, and has intended to invest, in a corporate security rather than make a deposit for safekeeping. The judgments of the Tax Court are accordingly severally

"Reversed."

While recognizing the "marked similarity in business procedure between the intake of funds by a bank through savings deposits and that of the taxpayers through the issuance of the thrift certificates," the Court seems to assume that the purchasers of the thrift certificates in Jackson did not purchase the certificates primarily for safekeeping, and that assumption seems to be based entirely upon the conclusion of the Court

---

1. The portion of § 104 represented by asterisks is:

"(a) Definition. As used in this section the term 'banks' means"

that because of the fact that banks are subject to more stringent governmental restrictions than institutions of the type discussed, an individual would not be inclined to make a deposit with such an institution as was under consideration. The Court's conclusion that the purchasers of the thrift certificates were not depositors seems to rest upon this assumption that a purchaser of thrift certificates would not be held to be a depositor of the money represented by such a certificate for the slender reason that the money might be safer in a bank than in an institution such as was under consideration.

If it be the reasoning of the Court in the Jackson case that purchasers of the thrift certificates were not motivated by the purpose and desire of putting their money in a reasonably safe place, we cannot agree with any such view. The fact that the purchasers of thrift certificates would receive 4% interest and that depositors in banks would receive but 2½% interest would not lure a reasonable individual to the extent that he would abandon the idea of obtaining a safe place for his money. The only reasonable conclusion is that an ordinary individual purchasing a thrift certificate from this Utah institution would not enter into any such transaction if he did not believe the institution a reasonably safe place to place his funds.

The Jackson decision evidently is based, at least to a substantial extent, upon the following:

That Utah has provided strong safeguards for those who deposit money in its banks;

that, as in our case, under state law the thrift certificates must state on their face and do state on their face, "This is not a certificate of deposit";

upon the fact that industrial loan companies, like respondent in our case, are prohibited by state law from using the word "bank" or "bank deposits" in their business;

and for these and other reasons or prohibitions defined by the Utah law, the Court could not see its way clear to define the institution it was considering as a bank and/or could not consider the money placed with it by sales of thrift certificates as deposits.

All these considerations must give way under the influence of the Federal law. As was explained in Morris Plan Bank of New Haven v. Smith, supra, the following quotation from that case will bear repeating here:

"Whether such payments are distinguished from deposits under state law is not controlling in construing a federal taxing statute which does not expressly or by necessary implication make its application dependent upon what the law of a state may provide. Were it otherwise the varying laws of the states might well make impossible general uniformity of national taxation throughout the country."

The determinative conclusion of the Court of Appeals of the Tenth Circuit in Jackson that the certificates there under consideration were intended to be evidences of indebtedness to a purchaser who has invested, and has intended to invest, in a corporate security rather than make a deposit for safekeeping, is not supported by reason and has no application to the present case. It cannot be said in this case, and there is no evidence in the record to support a conclusion that the purchasers of the thrift certificates of respondent were not motivated and largely influenced by the desire and purpose of obtaining a place of safekeeping for their money. And we find no such evidence in the record in No. 17135, Commissioner of Internal Revenue, Petitioner, v. Morris Plan Company of California, Respondent.

That the transaction involving the purchase of a thrift certificate issued by the Morris Plan Company of California, and the withdrawal of a portion or all of the money paid for such certificate is similar to and almost identical with the procedure involved in deposits in a bank,

appears from the following testimony of Mr. Ralph N. Larson, the president of that institution:

"Q. Now, Mr. Larson, if a person wanted to open or obtain one of these installment accounts, just what would he do?

"A. If he wanted to come in and buy an installment investment Thrift Certificate, he would come in and hand us X number of dollars and say, 'I want to purchase an Installment Investment Certificate,' and we would have him sign a signature card. We would have him sign this register card and then we would issue the booklet to him and he would walk out with it.

"Q. That is he would approach a teller?

"A. No, he would not. He would, the general practice is he would go to a man or woman sitting at a desk.

"Q. And what if a person comes in and says, 'I want to open an account, I have $10,' then what happens?

"A. We would follow that procedure.

"Q. You fill out some sort of a record card?

"A. We have him sign a registered card and a signature card and issued the Installment Certificate to him.

"Q. Now, if I had $5 and wanted to open a savings account at your Upper Avenue Bank in Chicago, would I do anything differently?

"A. No.

"Q. Now, after the account is opened, and I have been fortunate enough to have about $50 in it and I want to go on a vacation, how do I get some of the money out?

"A. Simply walk into a window in our cashier's department and say, 'I would like to take out a certain amount, X number of dollars.'

"Q. That is, you walk up to a teller and then you tell them you want to withdraw some money?

"A. That is correct, yes.

"Q. You don't have to fill out any form?

"A. Don't have to fill out anything. You simply sign your name on this register.

"Q. In that one respect it is a little simpler than withdrawing it from a savings account where they might ask you to fill out some sort of withdrawal certificate?

"A. It is a different procedure there, yes.

"Q. Not materially different because you walk up to a teller anyway, and give him a book, isn't that about what it amounts to?

"A. That is right.

"Q. Now, on the Installment Certificates you state that you can add as little as you like and you can withdraw assuming you have funds in there; is that correct?

"A. We always state in our advertising that we have always honored all withdrawals on request, yes."

The transactions evidenced by the above testimony have none of the characteristics of money borrowing for the purposes of a business as contemplated by § 439 of the Excess Profits Tax Act. Such transactions are like deposits and, in fact, are deposits.

In Staunton Industrial Loan Corporation v. Commissioner of Internal Revenue, 4 Cir., 120 F.2d 930, at the outset of its opinion, the Court said:

"This is a petition to review the decision of the United States Board of Tax Appeals (hereinafter called the Board), wherein there was a redetermination of deficiencies in the income and excess profit taxes paid by the Staunton Industrial Loan Corporation."

The institution there involved is similar in many respects to those here under consideration. The Court dealt with

problems similar to those we have to consider. We quote from the opinion beginning on p. 933 of 120 F.2d:

"[1] The laws of Virginia, for reasons which that State apparently thinks are compelling, draw a definite line between 'banks' and 'industrial loan associations'. However, we do not believe that the peculiarities in individual state laws are controlling on this court in the interpretation of section 104. * * Hence, though a particular institution falls without the definition of a 'bank' as drafted by a state legislature, this same institution may well fall within the clear policy and broad definition stated by Congress.

"[2] All of the business of petitioner consists of receiving deposits, specifically termed 'investments', and of making loans and discounts. Interest is paid on the deposits at a rate fixed by its Board of Directors. A legal rate of interest is charged in advance upon the entire amount of the loans made. It is true that checks drawn on accounts in other institutions are not accepted as deposits, or so-called 'certificates of investments', and that petitioner has no authority to accept deposits subject to check. But money is withdrawn by depositors through the use of check-like forms furnished by petitioner. And, though petitioner has a regulation which states that 'checks' are not to be drawn payable to persons other than the petitioner, petitioner, where this regulation is violated, does honor such checks when they are presented by endorsees at petitioner's place of business. There is no dispute over the fact that petitioner is subject by the law of the State of Virginia to supervision and examination by the very same authority which supervises within the State all commercial and other banking institutions, i. e., by the Banking Department of the Corporation Commission of Virginia.

"The sum total of petitioner's business activities indicates that petitioner comes within the classification set out in section 104 of a 'bank', and within the general meaning of that term. Bouvier's Law Dictionary * * *. [Then follow definitions of a bank from Bouvier's Law Dictionary, Ballentine's Law Dictionary, Funk & Wagnalls New Standard Dictionary, and Black's Law Dictionary.]

"[3] A reading of these general definitions clearly reveals that the chief functions of a bank involve: (1) the receipt of deposits from the general public, repayable to the depositors on demand or at a fixed time, (2) the use of deposit funds for secured loans, and (3) the relationship of debtor and creditor between the bank and the depositor. These seem to be the bare requisites; for, certainly, an institution may still be given the general classification of a 'bank' despite many other extensive and varied activities. Indeed, the title 'bank' will vary with differences in the purpose of classification. * * * In Oulton v. German Savings & L. Soc. 1872, [17 Wall. 109,] 84 U.S. 109, [21 L. Ed. 618,] * * *, Mr. Justice Clifford enunciated a definition of banks which has now become classic: 'Banks in the commercial sense are of three kinds, to wit: 1, of deposit; 2, of discount; 3, of circulation. Strictly speaking the term bank implies a place for the deposit of money, as that is the most obvious purpose of such an institution. Originally the business of banking consisted only in receiving deposits, such as bullion, plate, and the like, for safekeeping until the depositor should see fit to draw it out for use, but the business, in the progress of events, was extended, and bankers assumed to discount bills and notes and to loan money upon mortgage, pawn, or other security, and at a still later period to issue notes of their

own intended as a circulating currency and a medium of exchange instead of gold and silver. Mcdern bankers frequently exercise any two or even all three of those functions, but it is still true that an institution prohibited from exercising any more than one of those functions is a bank in the strictest commercial sense * * *.'

* * * * * *

"A 'bank' is defined in section 104 (a) as 'a bank or trust company * * * doing business under the laws of the United States * * *, of any State, or of any Territory, a substantial part of the business of which consists of receiving deposits and making loans and discounts, or of exercising fiduciary powers similar to those permitted to national banks * * *, and which is subject by law to supervision and examination by State or Federal authority having supervision over banking institutions.' We are of the opinion that the activities of petitioner bring it within the express terms of this statute, as well as within the commonly understood definition of a 'bank'. We are of the further opinion that the Board erred in concluding that the peculiarities of state laws were determinative of the instant issue.

"[4-7] This Court has often observed that taxation is concerned with realities and that, in considering tax matters, we are controlled by matters of substance and not of form. Cf. Dodge Brothers v. United States, 4 Cir., 118 F.2d 95, 102, 103 (C.C.A.4th, 1941). Also, Weiss v. Stearn, 1924, 265 U.S. 242, 254, 44 S.Ct. 490, 68 L.Ed. 1001, 33 A. L.R. 520. By looking at the substance of petitioner's business transactions, we have been immediately led to the instant conclusion. We cannot accept the proposition that a special classification given by state law can so act as to withdraw an institution, which possesses the essential characteristics of a bank, from the protection afforded by the wording of, and the policy underlying, section 104. Furthermore, we are mindful that, wherever possible, federal taxing statutes are to be uniformly interpreted. [Citing cases.] As Mr. Justice Stone recently stated in United States v. Pelzer, March 3, 1941 [312 U.S. 399], 61 S.Ct. 659, 661, 85 L.Ed. 913: 'But as we have often had occasion to point out, the revenue laws are to be construed in the light of their general purpose to establish a nationwide scheme of taxation uniform in its application. Hence their provisions are not to be taken as subject to state control or limitation unless the language or necessary implication of the section involved makes its application dependent on state law.'

"We believe that the implication of section 104 does not make 'its application dependent on state law', and that our present conclusion is in accord with the views expressed above by Mr. Justice Stone. Any other conclusion might lead to results so weird that, under the argument ab inconvenienti, we cannot believe Congress intended these strange and contradictory results. The interpretation placed by the Board on section 104 might well result in levying this tax on substantially similar financial institutions in half of the States of the United States and in relieving from the tax these institutions in the other half of the States. We cannot lend our approval to an interpretation of a federal taxing statute which brings such things to pass.

"For the foregoing reasons, the decision of the Board is reversed."

We conclude from the foregoing that each of the institutions here is a bank as defined by § 104 of the Internal Revenue Code of 1939, as amended.

Our comments and the citations above have equal application to Valley Morris and Morris Plan of California.

The differences in the form or substance of the thrift certificates in each of these cases are of no consequence in determining the question whether the indebtedness evidenced by such certificates constituted borrowed capital within the meaning of § 439(b) (1).

■ The Tax Court erred in each of these cases:

1. In holding and deciding that respondents' obligations evidenced by their Term Thrift and Installment Thrift Certificates constitute borrowed capital within the meaning of § 439 of the Internal Revenue Code of 1939 (as amended by § 101 of the Excess Profits Tax Act of 1950);

2. In failing to hold and decide that respondents' obligations evidenced by their Term Thrift and Installment Thrift Certificates do not constitute borrowed capital within the meaning of said § 439 of the Internal Revenue Code of 1939;

3. In holding and finding that respondents were not banks for the purposes of the Excess Profits Tax Act of 1950.

In view of our conclusion that the indebtedness evidenced by the thrift certificates of each of the respondents do not constitute borrowed capital, we will consider what respondent Morris Plan of California designates· as its separate, distinct and alternative claim under § 444 of the Internal Revenue Code of 1939, as amended. As to this issue respondent states:

"The separate and distinct alternative issue which need not be considered if the Court affirms the decision of the Tax Court is as follows: Whether Respondent, in computing its excess profits tax credit for the purpose of arriving at 'adjusted excess profits net income' subject to excess profits tax in the calendar years 1950, 1951, and 1952, is entitled to compute its average base period net income under Section 444 (c) of the Internal Revenue Code of 1939, as amended, by reason of an increase in its capacity for pro-

duction or operation as defined in Subsection (b) (3) of said Section 444 (i. e., whether Respondent increased its capacity for operation by additions to its 'facilities' such that its 'unadjusted basis' for determining gain upon sale or exchange of its total 'facilities,' as defined in Section 444(d), on December 31, 1949, was 200% or more of such unadjusted basis on December 31, 1946)."

Petitioner states:

"The Tax Court did not pass on this question because it had granted the taxpayer relief under Section 439."

However, it appears that the issue was considered. The Tax Court stated:

"Your alternative contention for allowance of average base period net income and excess profits credit under Sections 444 and 447 of the Internal Revenue Code of 1939 as raised in your protest and accompanying application for the benefits of Section 444 is disallowed since you have failed to establish eligibility under Subsection 444(b) of the Internal Revenue Code of 1939, and Regulations 130, Sections 40.444–1 and 40.444–2, and the amount of average base period net allowable under Section 444(c)."

As to this claim petitioner stated:

"This alternative claim is based upon Section 440 [444] (a) and (b) (3). Briefly, this section provides a special rule for computing the excess profits tax credit if a taxpayer can show that it has increased the unadjusted basis of its total facilities during the period of December 31, 1946, to December 31, 1949. The application of Section 444 to this case is confined to a single narrow question, whether leasehold improvements held by the taxpayer are facilities, within the meaning of the section. If they are, then the taxpayer admittedly is not entitled to the benefits of the special rule provided by Section 444, since it did

not, according to the stipulated figures, increase its facilities including leasehold improvements by 200 percent."

In agreeing with this latter statement respondent Morris Plan Company of California says:

"As mentioned by Petitioner, the application of Section 444 to this case is confined to a single narrow question, namely, whether leasehold improvements held by Respondent at the specified periods are 'facilities' within the meaning of Section 444. Since the applicable portion of the definition of 'facilities' under Section 444(d) requires that they be 'depreciable tangible property,' it is clear neither nondepreciable tangible property nor intangible property qualify as 'facilities.' If Respondent's leasehold improvements are not 'facilities,' then by stipulation it qualifies to determine its average base period net income under Section 444(c)."

Section 444(d) defines "facilities" as:

"For the purposes of this section, the term 'facilities' means real property and depreciable tangible property, held by the taxpayer in good faith for the purposes of the business."

Respondent argues that its leasehold improvements were not depreciable and also that the leasehold improvements were not tangible. If respondent's leasehold improvements are within the category of real property and depreciable tangible property, they are facilities under the definition.

In H. D. & J. K. Crosswell v. Jones, Collector of Internal Revenue, D.C., 52 F.2d 880, it was held that:

Syll. 5. "Contracts acquired by partnership before incorporation, giving exclusive territorial right to bottle and sell Coca-Cola, for which corporation issued its stock, held 'tangible property,' not being 'intangible property,' within income tax statute."

In its opinion the Court, beginning on p. 881 of 52 F.2d said:

"It follows, therefore, that the sole question presented for determination by this court may be summed up as follows: 'Are the contracts acquired by the Plaintiff while a partnership and turned over to the Plaintiff a Corporation at the date of organization for capital stock in the Corporation tangible property or intangible property.' Section 325, Revenue Act of 1918, defines the terms involved.

" 'Sec. 325. (a) That as used in this title—

" 'The term "intangible property" means patents, copyrights, secret processes and formulae, good will, trade-marks, trade-brands, franchises, and other like property;

" 'The term "tangible property" means stocks, bonds, notes, and other evidences of indebtedness, bills and accounts receivable, leaseholds, and other property other than intangible property.'

"[1–3] It is very evident that, if we adopt a historical or scientific classification of property, these contracts must be held to be intangible. The difficulty arises by reason of the fact that the Revenue Act of 1918 repudiates the commonly accepted meanings of the words 'tangible' and 'intangible property,' and sets up a classification by its own terms. The act practically says that the distinctions between tangible and intangible property which have been recognized by legal history and the science of jurisprudence are not satisfactory for revenue purposes. * * *"

In the concluding portion of its opinion the Court stated:

"[6] Finally, there is the familiar rule that doubts in regard to a taxing statute should be resolved in favor of the taxpayer. The government by the act of 1918 set up new criteria by which to distinguish be-

tween tangible and intangible property. For the purposes of this case we are confined to the meanings of these terms as set out in this section of the statute.

"In that we cannot find that the contracts involved are patents, copyrights, secret processes, formulae, good will, trade-marks, trade-brands, or franchises, nor that these contracts fall under the phrase 'other like property,' we are forced to the conclusion that for the purposes of taxation these contracts must be held to be tangible property."

Respondent's leasehold improvements fall within the general definition of tangible property appearing in 73 C.J.S. § 5, p. 155 of the article on Property.

Arguing that its leasehold improvements were not depreciable, respondent says:

"Respondent did not claim a deduction for depreciation for such allowance, but, as stipulated, correctly computed its deduction based solely on the remaining term of the applicable lease and not on the life of the assets."

It was stipulated that:

"Leasehold improvements were included in Petitioner's (respondent's) tax returns and separately identified as part of its 'Depreciation Schedule,' and allowance therefor was also separately identified under the legend, 'Reserve for Depreciation.' Such allowance was correctly established based solely on the remaining term of the applicable lease and not on the life of the asset."

■ We are in agreement with the result reached by the Tax Court on this issue and hold that the leasehold improvements were facilities under the meaning of § 444 and that the taxpayer is not entitled to any relief under § 444 of the Internal Revenue Code of 1939.

With the exception of our discussion of the "alternative question," all of the above, unless otherwise indicated to the contrary, is to be considered as applying to both Valley Morris Plan and Morris Plan Company of California.

The decisions of the Tax Court in each of the cases are reversed.

Upon Petitions for Rehearing

PER CURIAM.

The following statement appears in the court's opinion at page 626:

"We conclude from the foregoing that each of the institutions here is a bank as defined by § 104 of the Internal Revenue Code of 1939, as amended."

The respondents, petitioners herein, point out in their petitions for rehearing that section 104 defines "banks" as being institutions which are, *inter alia*, "subject by law to supervision and examination by State * * * or Federal authority having supervision over banking institutions." Since in California banks are "supervised" by the Superintendent of Banks and respondents are "supervised" by the California Corporations Commissioner, the petitioners claim that a vital element in the definition of banks under section 104 is missing and that consequently petitioners cannot be "banks".

While strictly speaking the above mentioned element in the definition of "banks" would not appear to be present in this case, we are, nevertheless, of the opinion that petitioners are "banks" within the intent and meaning of section 104. The federal tax laws are to be administered uniformly. The petitioners in substance have all the attributes of banks for purposes of the taxes here involved and therefore they should be treated accordingly. The authorities which have been discussed establish that state law does not control what institutions are "banks" within the federal tax statutes. Just as in Staunton where the industrial loan association was organized under different state authority than were banks petitioners are organized in a manner different from banks and are controlled by different state authorities, albeit the

state controls are stringent in either case. California's statutory choice based upon state criteria of exercising control by different authority over similar institutions cannot bring these petitioners without the confines of the definition of "banks" for federal tax purposes where the pertinent characteristics of the petitioner institutions are in substance the same as banks.

The opinion of the court is amended by the foregoing, and the petitions for rehearing are denied.