*Decision will be entered under Rule 50.*

AUSTIN STATE BANK, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 755–69 and 2387–69.    Filed November 2, 1971.

*Lester M. Ponder* and *Edward W. Harris III*, for the petitioner.
*James J. McGrath*, for the respondent.

IRWIN, *Judge:* The respondent determined the following deficiencies in petitioner's income taxes:

| Calendar year | Deficiency |
|---|---|
| 1964 | $27,951.30 |
| 1965 | 52,924.50 |
| 1966 | 31,485.51 |

These amounts relate to two issues which we must determine: (1) Whether petitioner's business activities come within the ambit of the definition of a bank under section 581[1] so that petitioner is exempt from the personal holding company tax imposed by section 541; and (2) whether amounts paid to two of petitioner's officers as salary constitute reasonable compensation that is deductible under section 162. A third issue, the amount of pension plan deductions allowable with respect to the two officers, is merely a computational matter that depends upon our resolution of the second issue.

### FINDINGS OF FACT

Petitioner is the Austin State Bank, a corporation organized in 1909 under the laws of the State of Indiana according to the provisions of the Act for the Incorporation of Banks of Discounts and Deposits approved February 7, 1873, as amended. Petitioner's principal place of business at all relevant times has been Austin, Ind., and it filed its income tax returns for the years at issue with the district director of internal revenue, Indianapolis, Ind.

During 1964 the stock of the petitioner was owned as follows:

| | Shares | | Shares |
|---|---|---|---|
| Lloyd Jones, Scotsburg, Ind | 5 | John Scott Morgan, Austin, Ind | 64 |
| Ivan E. Morgan, Austin, Ind | 29 | Margaret E. Morgan, Indianapolis, Ind | 8 |
| Marion Lyons, Austin, Ind | 8 | Michele Morgan, Austin, Ind | 10 |
| T. N. Lyons, Austin, Ind | 20 | Lena Weir, Austin, Ind | 5 |
| Diann Morgan, Austin, Ind | 2 | John L. Bubul, Scottsburg, Ind | 5 |
| Elsinore Morgan, Austin, Ind | 45 | | |
| Fern Morgan, Austin, Ind | 37 | | |
| Ivan H. Morgan, Austin, Ind | 12 | Total | 250 |

During 1965 and 1966 stock of the petitioner was owned as follows:

| | Shares | | Shares |
|---|---|---|---|
| Lloyd Jones, Scottsburg, Ind | 5 | John L. Bubul, Scottsburg, Ind | 5 |
| Estate of Ivan E. Morgan, deceased | 29 | John E. Nichols, Terre Haute, Ind | 6 |
| Marion Lyons, Austin, Ind | 27 | William R. Nichols, Terre Haute, Ind | 6 |
| Diann Morgan, Austin, Ind | 2 | Steven S. Nichols, Terre Haute, Ind | 6 |
| Elsinore Morgan, Austin, Ind | 45 | | |
| Ivan H. Morgan, Austin, Ind | 12 | George O. Nichols, Terre Haute, Ind | 2 |
| John Scott Morgan, Austin, Ind | 64 | | |
| Margaret E. Morgan, Indianapolis, Ind | 26 | | |
| Michele Morgan, Austin, Ind | 10 | Total | 250 |
| Lean Weir, Austin, Ind | 5 | | |

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

The major business enterprise in Austin, Ind., which is a town of about 3,500 people, is the Morgan Packing Co., Inc., which is controlled by the family of Ivan H. Morgan. The Morgan Packing Co. employs about 3,000 people while the second largest employer in Austin, the American Can Co., employs about 120 people.

Petitioner was subject to supervision and inspection as a bank by the Department of Financial Institutions of the State of Indiana under section 18-2255, Ind. Ann. Stat. Although petitioner possessed such powers, it exercised no fiduciary powers during 1964, 1965, and 1966.

Petitioner was open for business 6 days a week. It had two full-time employees who handled the daily operations of the bank such as receiving deposits, cashing checks for the public, and maintaining its books and records. Petitioner shared a small rented room with the Austin Building & Loan Association, an unrelated institution; however, petitioner's business was conducted in a separate part of the room. Petitioner's name did not appear upon the public entrance to the shared room.

The total deposits held by petitioner at the end of each year in issue attributable to the Morgan Packing Co., its own employees, and the family and businesses of Ivan H. and Elsinore Morgan are the following:

|  | 1964 | 1965 | 1966 |
| --- | --- | --- | --- |
| Morgan Packing Co. | $230,060.66 | $300,589.64 | $221,011.32 |
| Bank officers and employees other than I. H. and E. Morgan | 4,245.65 | 3,468.73 | 3,733.72 |
| I. H. and E. Morgan and related accounts | 36,608.55 | 149,741.41 | 32,335.00 |
| Total related deposits | 270,914.86 | 453,799.78 | 257,080.04 |

Total deposits held by petitioner from all sources can be represented as follows:

|  | 1964 | 1965 | 1966 |
| --- | --- | --- | --- |
| Related | $270,914.86 | $453,799.78 | $257,080.04 |
| State of Indiana, local government | 2,298,024.07 | 381,189.85 | 346,446.66 |
| Other | 472,478.16 | 469,961.74 | 462,603.96 |
| Total | 3,041,417.09 | 1,304,951.37 | 1,066,130.66 |

The greatest part of deposits held by petitioner was demand deposits. A demand deposit is an account from which the funds can be withdrawn at any time by the order of the depositor. The most common form of a demand deposit is a checking account. Demand deposits pay no interest. By contrast, time deposits are accounts which are subject to restrictions on withdrawal and which pay interest. Certificates of deposit and savings accounts are common forms of time de-

posits. The following schedule represents petitioner's deposits during the years at issue:

| | Total deposits | Demand deposits | Time deposits |
|---|---|---|---|
| June 30, 1964 | $2,892,412.57 | $2,892,412.57 | |
| Dec. 31, 1964 | 3,041,417.09 | 3,041,417.09 | |
| June 30, 1965 | 1,397,534.90 | 1,397,534.90 | |
| Dec. 31, 1965 | 1,304,951.37 | 1,304,951.37 | |
| June 30, 1966 | 1,153,502.99 | 1,153,502.99 | |
| Dec. 31, 1966 | 1,066,130.66 | 921,330.66 | [1] $144,800 |

[1] Certificates of deposit held by the State of Indiana. The certificate of deposit of Apr. 3, 1965, in the amount of $62,800 does not appear on petitioner's report of condition.

Prior to the years in issue petitioner had discontinued making loans of less than $1,000 because such loans were often unprofitable and uncollectable. Petitioner pursued a policy of making loans of $1,000 or more only, which were secured by adequate collateral. Although petitioner refused no loans which met these requirements, few loans were made. During the period from 1964 to 1966 only 2 to 4 percent of petitioner's deposits were invested in loans. In every case the borrower had some business relationship with petitioner or the Morgan Packing Co.

Petitioner's loans outstanding during the years in issue were as follows:

### 1964

| | | | |
|---|---|---|---|
| Ralph Ellers | $2,500 | J. L. Bubul | $5,000 |
| P. H. Paulson | 5,000 | Roland Weir | 5,000 |
| Harold Fields | 5,000 | Culver Field | 5,000 |
| R. E. Perrin | 5,000 | Ray Manaugh | [1] 3,500 |
| Garland Langdon | 5,000 | Austin Building & Loan Assn | [2] 5,000 |
| Carl Morton | 5,000 | | |

### 1965

| | | | |
|---|---|---|---|
| Ralph Ellers | $2,500 | Carl Morton | $5,000 |
| P. H. Paulson | 5,000 | J. L. Bubul | 5,000 |
| Harold Fields | 5,000 | Roland Weir | 5,000 |
| R. E. Perrin | 5,000 | Culver Field | 5,000 |
| Garland Langdon | 5,000 | Ray Manaugh | [1] 3,500 |

### 1966

| | | | |
|---|---|---|---|
| Ralph Ellers | $2,500 | Carl Morton | $5,000 |
| P. H. Paulson | 5,000 | J. L. Bubul | 5,000 |
| Harold Fields | 5,000 | Roland Weir | 5,000 |
| R. E. Perrin | 5,000 | Culver Field | 5,000 |
| Garland Langdon | 5,000 | | |

[1] Repaid 1964 and 1965.
[2] Repaid 10/13/64.

The loans to P. H. Paulson, Harold W. Fields, R. E. Perrin, Garland Langdon, Carl Morton, John L. Bubul, Roland Weir and Culver Field were originally made in 1958 and subsequently renewed annually.

Petitioner's principal source of income during the period was from investments in securities issued by the U.S. Government. Petitioner's total income compared to income from investments in Government securities for 1964, 1965, and 1966 is as follows:

| | Interest on U.S. Government securities | Total income | Ratio of interest on U.S. Government securities to total income |
|---|---|---|---|
| | | | *Percent* |
| 1964 | $49,199.70 | $56,659.09 | 87 |
| 1965 | 99,996.81 | 107,336.62 | 93 |
| 1966 | 48,841.80 | 58,297.20 | 84 |

During the years at issue petitioner's president was Elsinore Morgan who succeeded Ivan H. Morgan to the presidency in 1960. The presidency of the bank was not a full-time job for Mrs. Morgan, and she did not keep regular hours or perform daily office functions at the bank. While she was president of the bank, Mrs. Morgan also managed a Dairy Queen, had an egg production company, operated a horse farm, and participated in the operation of a large cattle venture.

Mrs. Morgan did perform some services for petitioner. These included discussing overdrafts with Mrs. Gray, the cashier, once or twice a month, soliciting deposits for the bank, overseeing the maintenance of the office premises, discussing the acquisition of new office machinery, and signing any papers or documents which required her signature as president of petitioner. Mrs. Morgan also involved herself in preparing plans and seeking a new location for a new bank building.

Mrs. Morgan's salary for 1960 through 1962 was a token $10 per month which was paid retroactively on December 31, 1962. The amount paid was the same as that received by her predecessor in the presidency, Ivan H. Morgan. In 1963, by unanimous action of the board of directors, Mrs. Morgan's salary was increased to $100 per week, and she was paid $5,200 in 1964, $5,300 in 1965, and $5,200 in 1966. The directors' reason for increasing her salary was to compensate her for work in trying to relocate the bank in new quarters.

Ivan H. Morgan was president of petitioner from 1949 to 1960. After that time and during the years in question Mr. Morgan was chairman of the board and in charge of the loan program of petitioner and also solicited deposits from the State of Indiana and its political subdivisions. Mr. Morgan's duties for the bank did not require his regular presence at the bank, and in addition to them he was president of the Morgan Packing Co. and the Austin Water Co. In 1962, a unanimous vote of the board of directors awarded Mr. Morgan a yearly salary of $10,000 retroactive to 1961. This salary was awarded

because Mr. Morgan had gotten a large deposit for the bank from the State of Indiana in 1961. For each subsequent year the board has retroactively awarded Ivan H. Morgan $10,000 as compensation for services rendered during the prior year.

### OPINION

Petitioner is incorporated as a bank under the laws of the State of Indiana. Respondent claims that its banking activities are so minimal that it does not fit within the definition of a bank contained in section 581. If respondent's contention be true, petitioner is not entitled to the exemption from the personal holding tax imposed by section 541[2] provided in section 542(c)(2). The parties are in agreement that but for section 542(c)(2) petitioner would be subject to the personal holding company tax for the years in issue. As far as we have been able to determine, this is a case of first impression with respect to this issue.

Respondent has also determined that amounts paid as salary to Ivan H. Morgan and Elsinore Morgan were not reasonable compensation for services rendered and not deductible under section 162.

### Bank vs. Personal Holding Company

That petitioner was a bank under the laws of the State of Indiana is not open to serious question. It was chartered under the State's banking law and was subject to semiannual inspections by a State agency. However, the determination of whether petitioner as a bank is exempt from the personal holding company tax is a question of Federal tax law. *Staunton Industrial L. Corp.* v. *Commissioner*, 120 F. 2d 930 (C.A. 4, 1941). In particular, section 581 provides the following:

SEC. 581. DEFINITION OF BANK.

For purposes of sections 582 and 584, the term "bank" means a bank or trust company incorporated and doing business under the laws of the United States (including laws relating to the District of Columbia), of any State, or of

---

[2] SEC. 541. IMPOSITION OF PERSONAL HOLDING COMPANY TAX.

In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the undistributed personal holding company income (as defined in section 545) of every personal holding company (as defined in section 542) a personal holding company tax equal to 70 percent of the undistributed personal holding company income.

SEC. 542. DEFINITION OF PERSONAL HOLDING COMPANY.

(c) EXCEPTIONS.—The term "personal holding company" as defined in subsection (a) does not include—

\* \* \* \* \* \* \*

(2) a bank as defined in section 581, or a domestic building and loan association within the meaning of section 7701(a)(19) without regard to subparagraphs (D) and (E) thereof;

any Territory, *a substantial part of the business of which consists of receiving deposits and making loans and discounts*, or of exercising fiduciary powers similar to those permitted to national banks under authority of the Comptroller of the Currency, and which is subject by law to supervision and examination by State, Territorial, or Federal authority having supervision over banking institutions. Such term also means a domestic building and loan association. [Emphasis supplied.]

The parties agree and the facts indicate that the only part of section 581 whose application to petitioner is doubtful is the emphasized language dealing with the type of business done by the bank.

In our view petitioner looked like a bank, conducted business like a bank, and believed it was a bank. We must conclude that petitioner was a bank as we find little merit in respondent's arguments.

Although the present case is one of first impression concerning the imposition of the personal holding company tax upon a would-be bank, section 581, which sets forth the definition of a bank, does not present itself in a total vacuum. In *Staunton Industrial L. Corp.* v. *Commissioner, supra*, the court discussed the predecessor of section 581 as it was applicable in another context and concluded:

A reading of these general definitions clearly reveals that the chief functions of a bank involve: (1) the receipt of deposits *from the general public*, repayable to the depositors on demand or at a fixed time, (2) the use of deposit funds for secured loans, and (3) the relationship of debtor and creditor between the bank and the depositor. These seem to be the bare requisites; for, certainly, an institution may still be given the general classification of a "bank" despite many other extensive and varied activities. * * * [120 F. 2d 933–934. Emphasis supplied.]

The *Staunton* court here was summarizing the dictionary and general legal definitions of a bank but found the definition of the predecessor of section 581 to encompass nearly the same elements. This Court, then the Board of Tax Appeals, followed the reasoning of *Staunton* in *Mutual Savings & Loan Co.*, 44 B.T.A. 1204 (1941).

Respondent bases his argument, we believe, upon a myopic reading of the quoted portion of the *Staunton* decision. In his view, the deposits that petitioner received from related sources and from the State of Indiana and its political subdivisions are not to be considered in determining whether petitioner received deposits from the general public. While it makes sense for purposes of applying either the definition contained in section 581 or that of the *Staunton* case to exclude from consideration the deposits provided by the bank's own employees, its officers, and businesses with which it shared a common ownership, we do not understand respondent's reasons for excluding the deposits received from the State and its political subdivisions. Apparently, respondent feels that the *Staunton* court's use of the term "general public" justifies its argument.

As a primary matter, no reference is made in section 581 or its predecessors to the "general public," nor is there any indication in the *Staunton* decision that a distinction between deposits received from governmental instrumentalities and those received from other unrelated sources was in any way essential to framing a definition of a bank. While it is true that in many contexts a valid distinction may be drawn between the State on one hand and the general public on the other, we do not think that it may be properly drawn here. The State and its political subdivisions are customers of banking services like any private corporation or individual.[3] Respondent has shown us nothing significantly different about petitioner's relationship with its governmental customers from petitioner's treatment of any other customer.

If there is any significance to the use of the term general public in the *Staunton* definition of a bank, it is merely to differentiate between deposits received from sources in some way connected with the bank and those received from ordinary and unrelated customers of banking services. In this case, giving the broadest latitude to attempts to find related sources of deposits, we find that during the years in issue no more than 35 percent of petitioner's deposits came from related sources. In other words, at least 65 percent of its deposits were received from the general public.

Respondent also stresses the facts that only 2 to 4 percent of petitioner's deposits were invested in loans and that all of the borrowers had some kind of business relationship (in some cases quite a tenuous one) with either the bank or the Morgan Packing Co. We note that Austin, Ind., where petitioner is located, was a town of only 3,500 people and that the Morgan family and its businesses clearly dominated its economic life. In this situation we are not surprised that respondent found that all of petitioner's loan customers had some business relationship either with petitioner or the Morgan Packing Co. In addition, we believe the testimony of Ivan H. Morgan that petitioner could not have profited by pursuing a policy of making

---

[3] Respondent relies upon *Magruder* v. *Safe Deposit & Trust Co. of Baltimore*, 121 F. 2d 981 (C.A. 4, 1941), where it was held that the taxpayer therein did not meet the definition of a bank beause it failed to receive deposits from the general public. The following was essential to its finding: "The taxpayer did not receive deposits from the general public; the taxpayer was essentially a trust company, carrying on the activities thereunto appertaining; the deposits which it received were usually made in connection with its activities as a trust company. Apart from the deposits made by the trust company of the taxpayer with its own banking department, the other deposits received were peculiar in character and appear to have been limited to a few favored corporations. They were clearly not the ordinary commercial deposits which banks receive. [121 F. 2d 985.]" This case in no way dealt with the receipt of deposits from governmental instrumentalities and does not support respondent's claim that the deposits that petitioner received from the State should be excluded in determining whether it was a bank.

small loans and that there were not many large loans to be made in Austin, Ind.

Neither section 581 nor the *Staunton* decision attempts to set forth the minimum number of deposits that an institution must receive and the minimum number of loans that it must make to qualify as a bank. Taking everything in the record into consideration we believe that a substantial part of petitioner's business consisted of receiving deposits and making loans. Although no more is necessary to satisfy the requirements of section 581, we also note that petitioner conducted itself in the manner of a bank by having regular office hours 6 days a week, having two full-time employees, offering banking services to the general public, and submitting to periodic inspection by appropriate State banking authorities. Accordingly, we hold that petitioner was a bank and that section 542(c)(2) exempts it from the personal holding company tax.

### Reasonable Salaries

Respondent has determined that amounts that petitioner paid as salary to Elsinore and Ivan H. Morgan were not reasonable compensation for services and hence not deductible under section 162. Respondent's determination carries with it a presumption of correctness that petitioner must overcome with evidence that the amounts paid were reasonable compensation for services actually rendered. *Botany Mills* v. *United States*, 278 U.S. 282 (1929).

Upon becoming president of petitioner in 1960, Elsinore Morgan served without compensation; however, in December 1962, she was awarded a salary of $10 per month retroactive to 1960. This amount was the same token salary that her predecessor in the presidency, Ivan H. Morgan, had received. In 1963, her salary was increased to $100 per week by unanimous action of the board of directors, and she received $5,200 in 1964, $5,300 in 1965, and $5,200 in 1966. Respondent has determined that only $120 per year of the amounts paid represented reasonable compensation.

Respondent's contention is that Mrs. Morgan should have worked for nothing or next to nothing. We do not agree. In our Findings of Fact we set forth the modest duties that Mrs. Morgan performed for petitioner. We believe that the modest salary that she was paid was reasonable compensation for these services. It is immaterial that Mrs. Morgan's additional duties which were cited by the board of directors as the reason for granting her raise were not proportionate to the size of the raise. We find no authority for holding that Mrs. Morgan should be forever paid a token salary. The raise granted in 1963 merely adjusted her salary to the realities of the job that she performed.

The amounts paid as salary to Ivan H. Morgan for the years in issue appear in an entirely different light. Mr. Morgan was president of petitioner from 1949 to 1960. After that time and during the years in issue, Mr. Morgan had no official position as an employee of the bank but was chairman of the board and was in charge of its loan policy. Mr. Morgan solicited deposits from the State of Indiana and its political subdivisions. For these services he was paid $10,000 in each of the 3 years under consideration.

In our Findings of Fact we pointed out that Mr. Morgan held two other positions in addition to working for petitioner. In March 1961, Mr. Morgan secured a deposit from the State of Indiana in the amount of $2 million; however, since that time the record is devoid of any evidence that the bank benefited from his solicitations on its behalf. With the exception of Mr. Morgan's sketchy and uncorroborated testimony there is no evidence that he performed any service for the bank. Loans of over $1,000 with adequate security were routinely approved, and consequently, the small loan business done by the bank used only a negligible amount of his time. Mr. Morgan was adequately paid $20 for his attendance at each director's meeting. We cannot determine that the bank derived any other benefit which would justify any greater salary payment to Mr. Morgan. Accordingly, we sustain respondent's disallowance of the entire deduction for salary paid to Mr. Morgan during 1964, 1965, and 1966.

In view of the foregoing,

*Decisions will be entered under Rule 50.*