REPORTS

OF THE

# UNITED STATES TAX COURT

MoneyGram International, Inc. and Subsidiaries,
Petitioner *v*. Commissioner of Internal
Revenue, Respondent

Docket Nos. 12231–12, 30309–12.        Filed January 7, 2015.

To qualify as a "bank" under I.R.C. section 581, a taxpayer must meet three distinct requirements. First, it must be "a bank or trust company incorporated and doing business" under Federal or State law. Second, "a substantial part" of its business must "consist[ ] of receiving deposits and making loans and discounts." Third, it must be "subject by law to supervision and examination" by Federal or State authorities having supervision over banking institutions. P, a U.S. corporation, is in the "money services business." Its business involves the movement of money through three main channels: money transfers, money orders, and payment processing services. During 2007 and 2008 P undertook a recapitalization that included writing down or writing off a substantial volume of partially or wholly worthless securities. P claimed ordinary loss deductions on disposition of certain of these securities, a treatment available only to banks. *See* I.R.C. sec. 582. R disallowed the ordinary loss deductions on the ground that P did not qualify as a "bank."

1. *Held*: P during 2007 and 2008 did not qualify as a "bank" within the meaning of I.R.C. section 581 because it did not display the essential characteristics of a bank as that term is commonly understood and because a substantial part of its business did not consist of receiving bank deposits or making bank loans.

2. *Held*, *further*, because P was not a "bank" within the meaning of I.R.C. section 581, it was ineligible to claim ordi-

1

> nary loss deductions on account of the worthlessness of its securities under I.R.C. section 582.

*Henry Todd Miller*, *James A. Bruton*, *James Tazwell Fuller*, and *Peter J. Anthony*, for petitioner.

*Dana E. Hundrieser*, *Reid Michael Huey*, and *James L. Gessford*, for respondent.

## OPINION

LAUBER, *Judge*: With respect to petitioner's Federal income tax for the taxable years 2005–2007 and 2009, the Internal Revenue Service (IRS or respondent) determined deficiencies in the following amounts:

| Year | Deficiency |
|------|-----------|
| 2005 .............................. | $13,852,600 |
| 2006 .............................. | 25,471,993 |
| 2007 .............................. | 31,796,692 |
| 2009 .............................. | 11,644,589 |

In large part, these deficiencies stem from the disallowance of bad debt deductions that petitioner claimed for 2007 and 2008 under section 166(a) with respect to "non-real-estate mortgage investment conduit" (non-REMIC) asset-backed securities.[1] Normally, losses realized upon the worthlessness of such securities are deductible as capital losses under section 165(g)(1) and (2)(C). Under section 582(a), however, petitioner was entitled to bad debt deductions on account of these losses—deductible in full against ordinary income—if it qualified as a "bank" within the meaning of section 581. The parties have filed cross-motions for partial summary judgment on this question. We conclude that petitioner was not a "bank" within the meaning of section 581 and hence that the losses in question must be treated as capital losses. We will accordingly grant respondent's motion for partial summary judgment and deny petitioner's motion.

---

[1] All statutory references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

## *Background*

The following facts are not in dispute. MoneyGram International, Inc., is incorporated in Delaware and headquartered in Texas. It is the parent of a group of companies that operate a global payment services business. This business is conducted chiefly through MoneyGram Payment Systems, Inc. (MPSI), a wholly owned subsidiary incorporated in Delaware. We will refer to MoneyGram International, Inc., and its subsidiaries, including MPSI, as petitioner or MoneyGram.

### *MoneyGram's Lines of Business*

MoneyGram has been in business since 1940. Its core purpose is to provide consumers and financial institutions with payment services that are affordable, reliable, and convenient. MoneyGram's business involves the movement of money through three main channels: money transfers, money orders, and payment processing services.

MoneyGram sells money orders and money transfer services to consumers through "agents." These agents include banks, credit unions, supermarkets, convenience stores, and other retail locations. MoneyGram's agents range from well-known businesses such as Wal-Mart (during the years in issue), Albertson's, and CVS Pharmacy, to thousands of "mom and pop" convenience stores. MoneyGram sells payment processing services directly to banks and other financial institutions.

A money transfer involves the transfer of funds from a consumer at one location to a consumer at a different location in the United States or abroad. In a typical money transfer, a consumer goes to the location of a MoneyGram agent, completes a form, and pays the agent the money to be transferred (plus a fee). This form explicitly states that the agent is not accepting a "deposit."

In a matter of minutes, the funds are made available for payment to the designated recipient, in various currencies, through MoneyGram's agent network. The fee paid by the consumer at the sending location is based on the amount to be transferred and the location at which the funds are to be received. The "sending" and "receiving" agents each receive a commission from MoneyGram on the transaction.

MoneyGram derives its revenue from the transaction fees paid by consumers and from management of currency exchange spreads on international money transfers.

MoneyGram in 2007 was the leading issuer of money orders in the United States. It sells money orders under the MoneyGram brand, on a private label basis, and under co-branding arrangements with retail agents. Money orders, much like checks, can be presented by a consumer to make a payment or receive cash. To obtain a money order, a customer enters the location of a MoneyGram agent and gives the agent cash equal to the money order amount (plus a fee). The customer receives a blank money order in that amount. He completes the money order by filling in the name of the person to whom the money order is to be paid and signing the order. Once presented for payment, the money order is cleared through the Federal Reserve interbank system. Typically, money orders remain outstanding for fewer than ten days.

MoneyGram generally receives a transaction fee from its agents for each money order sold. MoneyGram also derives revenue from the investment of funds remitted by its agents. MoneyGram earns income on these funds until the money orders are cleared through the banking system or (if not presented for payment) escheat to the relevant State. Outstanding money orders are classified as "payment service obligations" and treated as liabilities on MoneyGram's consolidated financial statements.

In the absence of an agreement otherwise, when a customer purchases a money order by giving cash to a MoneyGram agent, the agent must remit these funds to MoneyGram immediately. However, MoneyGram typically enters into agreements with its agents allowing them to retain and use these funds for an agreed-upon period. These agreements, called "delayed remittance agreements," set forth a schedule that generally requires agents to remit funds to MoneyGram twice weekly.

To effectuate a delayed remittance agreement, MoneyGram and its agent typically execute a "Master Trust Agreement" (MTA). Under the MTA MoneyGram's agent accepts appointment as "Trustee" for MoneyGram. The MTA defines "Trust Funds" as "fees, face amounts of money orders, gift certificates, money transfer checks, principal amounts of * * *

money transfers and all proceeds from the sale" of money transfer services. The agent "agrees to hold Trust Funds in trust for * * * [MoneyGram] and separate from Trustee's funds."

Funds due MoneyGram under delayed remittance agreements are classified as "accounts receivable" and treated as assets on MoneyGram's consolidated financial statements. MoneyGram does not charge interest on these accounts receivable unless a remittance is late. In that event, the MTA states that MoneyGram "may charge interest at the highest legal rate until payment is made."

Whereas money transfers and money orders usually involve transactions with individual consumers, MoneyGram's "payment systems" segment provides services to financial institutions. These services generally consist of payment processing, including the provision of money orders for sale to financial institution clients and outsourcing services for "official checks."

Financial institutions provide clients with official checks, such as bank checks, cashier's checks, and teller checks, for use in various transactions. Official checks are commonly used in closings of consumer home and car loans and in other situations where the payee requires assurance of payment and availability of funds. Financial institutions also use official checks to pay their own obligations. In 2007 MoneyGram provided official check services to more than 1,900 financial institutions, consisting mainly of banks, thrifts, and credit unions.

Typically, MoneyGram and its customer (say a bank) execute a "payment processing services agreement" that lasts between three and five years. Before the first day on which the bank issues official checks, it supplies MoneyGram with funds equal to its anticipated average daily volume of official checks. This is called the "first day settlement." At the end of each business day, the bank generates a settlement report showing the dollar volume of official checks it issued that day. The bank then transfers funds in that amount to MoneyGram, typically before 11 a.m. central time the next business day. As official checks clear, the bank's account balance with MoneyGram is drawn down, but it is replenished with funds from the next day's settlement report. If a bank issues significantly more official checks than anticipated, its

account balance with MoneyGram may temporarily go negative. In that event, MoneyGram will allow the bank's official checks to clear, but will demand payment from the bank that same business day.

MoneyGram receives fees from financial institution customers for its official check services and related money order services. MoneyGram also derives revenue from the temporary investment of funds remitted from its financial institution customers until such time as the official checks and money orders clear. Outstanding official checks and money orders are classified as "payment service obligations" and treated as liabilities on MoneyGram's consolidated financial statements.

### *Regulation of MoneyGram*

MoneyGram is registered with the Department of the Treasury as a "money services business" (MSB). MSBs include money transmitters, check cashing services, issuers and sellers of money orders, and issuers and sellers of travelers checks. MoneyGram is subject to regulation under title 31 of the United States Code and title 31 of the Code of Federal Regulations, which govern "Money and Finance." Other money transmitters and check issuers, such as Western Union and American Express Travel Related Services, are also regulated as MSBs.

As an MSB, MoneyGram is subject to laws covering data protection, consumer protection, and consumer privacy; to anti-money-laundering laws; and to State licensing requirements. MoneyGram is licensed and regulated as a money transmitter by most States, the District of Columbia, and the Commonwealth of Puerto Rico. To be licensed as a money transmitter, MoneyGram must satisfy State law requirements concerning minimum net worth, provision of surety bonds, and compliance with operational procedures. It must also maintain reserves or "permissible investments" adequate to meet its outstanding payment obligations. The types of securities that are considered "permissible investments" vary from State to State but generally include U.S. Government securities and other highly rated debt instruments.

Banks are generally regulated under title 12 of the United States Code and title 12 of the Code of Federal Regulations, which govern "Banks and Banking." All U.S. banks are sub-

ject to supervisory regulation by one or more Federal banking regulators, viz., the Federal Reserve Board, the Office of the Comptroller of the Currency (OCC), and/or the Federal Deposit Insurance Corporation (FDIC). All U.S. banks that receive deposits generally maintain deposit insurance through the FDIC.

MoneyGram is not subject to regulation under title 12, and it has never been regulated as a bank by any Federal banking regulator. MoneyGram has never maintained deposit insurance through the FDIC. No MoneyGram affiliate is incorporated as a bank under State law. As a licensed money transmitter, MoneyGram is subject to financial regulation in every State in which it does business, generally by officials of the State banking (or similar) department.

As a publicly held corporation, MoneyGram files with the Securities and Exchange Commission (SEC) Forms 10–K, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. On its Forms 10–K MoneyGram has described itself as a "global payment services company" that conducts two business segments: "global funds transfer," consisting primarily of money transfers and money orders, and "payment systems," consisting primarily of payment processing services for financial institutions. MoneyGram has never represented to the SEC or to its shareholders that it is a bank or that any part of its business consists of receiving deposits or making loans. The financial statements that accompany MoneyGram's Forms 10–K do not list any "loans" among its assets and do not list any "deposits" among its liabilities.

For 2005–2007 MoneyGram filed with the IRS annually Form 1120, U.S. Corporation Income Tax Return. On these returns MoneyGram classified its business as "nondepository credit intermediation" (business activity code 522298). Activities within "nondepository credit intermediation" include money transmitting, check clearing, and loan brokering. On none of these returns did MoneyGram classify its business as "depository credit intermediation" (business activity codes 522110, 522120, 522130, and 522190). Activities within "depository credit intermediation" include the activities of commercial banks, savings institutions, credit unions, and other financial institutions that accept deposits.

For 2008 MoneyGram filed with the IRS a Form 1120 that again classified its business as "nondepository credit intermediation." But while continuing to use business activity code 522298, MoneyGram changed the typed description of its business activity and of its products and services. Whereas its prior returns had described its business activity as "payment services/credit agency," its 2008 return described its business activity as "banking." And whereas its prior returns had described its products and services as "money/wire transfers," its 2008 return described its products and services as "financial services." No meaningful change in MoneyGram's mode of operation occurred between 2007 and 2008.

*The Present Controversy*

At the beginning of 2007 MoneyGram held asset-backed securities valued at approximately $4.2 billion. During 2007 and 2008, global financial markets experienced turmoil. In response, ratings agencies undertook reviews of asset-backed securities, especially mortgage-backed securities. Many of these securities, formerly rated A or higher, were suddenly downgraded to "junk bond" status. These securities lost much of their value.

Because its asset-backed securities were no longer rated A or higher and had declined precipitously in value, MoneyGram by yearend 2007 had fallen out of compliance with State law requirements concerning "permissible assets" and minimum net worth. To satisfy State regulators' demands and ensure sufficient operational liquidity, MoneyGram undertook a recapitalization that included writing down or writing off a substantial volume of partially or wholly worthless asset-backed securities. Upon completion of this recapitalization in March 2008, MoneyGram brought itself back into compliance with State regulatory demands.

As a result of this recapitalization MoneyGram reported on its 2007 and 2008 Federal income tax returns substantial losses with respect to its asset-backed securities portfolio. These asset-backed securities fell into two categories: REMIC and non-REMIC. The parties have filed a stipulation of settled issues that resolves all matters arising from the IRS' disallowance of deductions in connection with MoneyGram's disposition of its regular REMIC interests.

The question the parties have submitted for resolution by summary judgment concerns MoneyGram's disposition of its non-REMIC asset-backed securities. On its 2007 and 2008 Federal income tax returns MoneyGram claimed under section 166(a) bad debt deductions of $524,435,525 and $16,516,192, respectively, on account of the partial or complete worthlessness of those securities. (Treating these losses as capital losses would have generated no current tax benefit for MoneyGram because it had no capital gains net income during 2007 and 2008 against which capital losses could be offset.) The IRS determined that these securities were "debts evidenced by a security" under section 165(g)(2)(C) and hence that MoneyGram could claim bad debt deductions, as opposed to capital losses, only if it were a "bank" within the meaning of section 581. *See* sec. 582(a). The IRS determined that MoneyGram was not a "bank" and hence disallowed the bad debt deductions.[2] MoneyGram timely petitioned this Court in response to the notice of deficiency that followed.

## *Discussion*

### I. *Summary Judgment Standard*

The purpose of summary judgment is to expedite litigation and avoid unnecessary and expensive trials. *See FPL Grp., Inc. & Subs. v. Commissioner*, 116 T.C. 73, 74 (2001). We may grant partial summary judgment when there is no genuine dispute of material fact and a decision may be rendered as a matter of law. Rule 121(b); *Elec. Arts, Inc. v. Commissioner*, 118 T.C. 226, 238 (2002). The parties agree on all questions of basic fact and have expressed that consensus by filing cross-motions for partial summary judgment. We conclude that the question presented is appropriate for summary adjudication.

### II. *Governing Statutory Framework*

Section 165 governs "losses." Petitioner concedes that "non-REMIC asset-backed securities" are debts evidenced by a

---

[2] MoneyGram contends that it made an informal claim for refund that increased by $14,760,201 the bad debt deduction it claimed for 2007. Given our disposition of these cases, we need not address the magnitude of the deduction.

"security" within the meaning of section 165(g)(2)(C). Thus, losses realized on the worthlessness of petitioner's non-REMIC asset-backed securities would normally be treated as losses "from the sale or exchange, on the last day of the taxable year, of a capital asset." Sec. 165(g)(1). For corporations, capital losses for a particular year are deductible only to the extent of capital gains for that year. Sec. 1211(a).

Section 166, captioned "Bad Debts," allows a deduction for any debt that "becomes [wholly] worthless" or becomes "recoverable only in part" during the taxable year. Sec. 166(a)(1) and (2). Section 166(e), however, provides that "[t]his section shall not apply to a debt which is evidenced by a security as defined in section 165(g)(2)(C)." Because non-REMIC asset-backed securities are debts "evidenced by a security," a taxpayer generally cannot claim a bad debt deduction on account of the partial or complete worthlessness of these securities.

Banks are entitled to special treatment. Section 582(a) provides that "[n]otwithstanding sections 165(g)(1) and 166(e), subsections (a) and (b) of section 166 (relating to allowance of deduction for bad debts) shall apply in the case of a bank to a debt which is evidenced by a security as defined in section 165(g)(2)(C)." The term "bank" is defined in section 581. It provides:

> For purposes of sections 582 and 584, the term "bank" means a bank or trust company incorporated and doing business under the laws of the United States (including laws relating to the District of Columbia) or of any State, a substantial part of the business of which consists of receiving deposits and making loans and discounts, or of exercising fiduciary powers similar to those permitted to national banks under authority of the Comptroller of the Currency, and which is subject by law to supervision and examination by State, or Federal authority having supervision over banking institutions. Such term also means a domestic building and loan association.

MoneyGram does not contend that it is "a domestic building and loan association" or that it "exercis[es] fiduciary powers." To qualify as a "bank" as defined by section 581, therefore, MoneyGram must meet three requirements. First, it must be "a bank or trust company incorporated and doing business" under Federal or State law. Second, "a substantial part" of MoneyGram's business must "consist[] of receiving deposits and making loans and discounts." Third,

MoneyGram must be "subject by law to supervision and examination" by Federal or State authorities having supervision over banking institutions.

### A. *"Bank or Trust Company"*

The first requirement for "bank" status is set forth in the principal clause of the first sentence of section 581: "For purposes of sections 582 and 584, the term 'bank' means a bank or trust company incorporated and doing business under the laws of the United States (including laws relating to the District of Columbia) or of any State." This clause has a readily ascertainable meaning. To be classified as a "bank," an entity must be incorporated and must be a bank or trust company within the common understanding of those terms. [3]

The statute's text makes clear that this first requirement—that an entity be a "bank" as the term is commonly understood—is a distinct requirement, separate from the requirements that it accept deposits, make loans, and be subject to banking regulation. These latter requirements are set forth in a pair of restrictive relative clauses that follow the principal clause. These clauses specify two features that an entity must have, apart from being a "bank" as commonly understood, in order to be a "bank" within the meaning of section 581: a substantial part of its business must consist of receiving deposits and making loans, and it must be subject to regulation by Federal or State banking authorities. Basic rules of English syntax require that the principal clause of a sentence be given meaning independent from that of succeeding subordinate clauses. And elementary rules of statutory construction require that we interpret section 581 so that no clause, sentence, or word is rendered superfluous, void, or insignificant. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001); *Sophy v. Commissioner*, 138 T.C. 204, 211 (2012).

In the seminal case in this area, the Court of Appeals for the Fourth Circuit interpreted the predecessor of section 581

---

[3] The same principle of construction applies to the second sentence of section 581: "Such term also means a domestic building and loan association." An entity can qualify as a "bank" under this sentence only if it is a "domestic building or loan association" within the common understanding of that term. Since MoneyGram does not contend that it is a "trust company" or a "domestic building and loan association," the relevant inquiry is whether it is a "bank" as the term is commonly understood.

consistently with these principles. *See Staunton Indus. Loan Corp. v. Commissioner*, 120 F.2d 930 (4th Cir. 1941), *rev'g* 42 B.T.A. 1030 (1940). The question in *Staunton* was whether an entity chartered as an "industrial loan corporation" under Virginia law was a "bank" within the meaning of section 104(a) of the Revenue Act of 1936 (1936 Act), ch. 690, 49 Stat. at 1677. The Court of Appeals for the Fourth Circuit held that "the peculiarities of state laws" were not determinative in answering this question, reversing the Board of Tax Appeals (this Court's predecessor) on that point. *See Staunton*, 120 F.2d at 932, 934. The Court of Appeals thus held that an entity can be a "bank" for Federal tax purposes even though it is not chartered as a bank under State law. [4]

The Court of Appeals in *Staunton* then considered the definition of "bank" set forth in section 104(a) of the 1936 Act, which was essentially the same as the current definition in section 581. *See Austin State Bank v. Commissioner*, 57 T.C. 180, 186 (1971) (noting that section 581 and its predecessor statute encompass "nearly the same elements"). Section 104(a) provided that "the term 'bank' means a bank or trust company incorporated and doing business" under Federal or State law, "a substantial part of the business of which consist[ed] of receiving deposits and making loans," and which was "subject by law to supervision and examination" by Federal or State banking authorities. The Court of Appeals in *Staunton*, 120 F.2d at 933, quickly determined that "[a]ll of the business of petitioner consists of receiving deposits * * * and making loans" and that it was subject to "supervision and examination" by Virginia banking authorities. But the Court's analysis did not stop there. It went on to consider the "sum total of petitioner's business activities" to ascertain whether "petitioner comes within the classification set out in section 104 of a 'bank', and within the general meaning of that term." *Ibid.*

The Court of Appeals concluded that an entity must manifest three basic features to be classified as a bank: "(1) the receipt of deposits from the general public, repayable to the

---

[4] In *Mutual Sav. & Loan Co. of Norfolk v. Commissioner*, 44 B.T.A. 1204, 1205 (1941), the Board of Tax Appeals decided to follow the decision of the Court of Appeals in *Staunton*, ruling that an industrial loan corporation could be a "bank" within the meaning of section 104(a) of the 1936 Act even though it was not chartered as a bank under State law.

depositors on demand or at a fixed time; (2) the use of deposit funds for secured loans; and (3) the relationship of debtor and creditor between the bank and depositor." *Staunton*, 120 F.2d at 933–934. The court determined that the industrial loan company displayed these features, which it described as "the bare requisites" for bank status, and also noted that it "was eligible for membership in the Federal Reserve System." *Id.* at 934, 932. Because the taxpayer "possesse[d] the essential characteristics of a bank," received deposits, made loans, and was subject to banking regulation, the court held that its activities brought it "within the express terms of this statute, as well as within the commonly understood definition of a 'bank'." *Id.* at 934. The Court of Appeals for the Fourth Circuit has described the "interpretative technique" it adopted in *Staunton* as "a practical, commercial, functional approach" to determining what constitutes a "bank." *Magruder v. Safe Deposit & Trust Co. of Balt.*, 121 F.2d 981, 985 (4th Cir. 1941).[5]

Under *Staunton* and its progeny, an incorporated entity will satisfy the first requirement of the section 581 definition, even though it is not chartered as a bank under State law, if it possesses the essential characteristics of a bank. MoneyGram and its affiliates are organized under Delaware General Corporation Law; no MoneyGram affiliate is chartered as a bank under the law of any State. In order to be

---

[5] In *Safe Deposit & Trust Co. of Balt.*, 121 F.2d at 985, the Court of Appeals for the Fourth Circuit brought the same "practical, commercial, functional approach" to interpretation of section 117(d) of the Revenue Act of 1934, 48 Stat. at 715. That provision afforded certain tax benefits to "a bank or trust company incorporated under the laws of the United States or of any State * * * a substantial part of whose business is the receipt of deposits." The court ruled against the taxpayer: "We entertain no doubt that the taxpayer is a 'trust company incorporated under the laws' of Maryland; but we do not think it can qualify under the second and equally essential clause of the exempting statute: 'a substantial part of whose business is the receipt of deposits'." *Safe Deposit & Trust Co. of Balt.*, 121 F.2d at 982. In that case, as in *Staunton*, the court treated the statutory requirement that an institution be a "bank or trust company" as distinct from the requirement that it accept deposits. *See also Morris Plan Bank of New Haven v. Smith*, 125 F.2d 440, 441 (2d Cir. 1942) (holding that an industrial loan corporation forbidden by Connecticut law to receive "deposits" was nevertheless a "bank" under the predecessor to section 581 in part because "in other essential respects it admittedly fell within the definition").

classified as a "bank" under section 581, therefore, MoneyGram must possess the essential attributes of a bank. We find that it does not do so.

MoneyGram does not meet "the bare requisites" for bank status enumerated in *Staunton*. 120 F.2d at 934. The amounts that MoneyGram seeks to characterize as "deposits" consist of funds, held by MoneyGram for temporary investment, that are remitted by its money order agents and its 1,900 financial institution customers. These agents and institutions are connected with MoneyGram by preexisting contractual relationships; members of the public who lack these business connections with MoneyGram cannot make the types of payments it seeks to characterize as "deposits." For this reason, MoneyGram would not appear to "recei[ve] * * * deposits from the general public." *See id.* at 933–934; *Austin State Bank*, 57 T.C. at 187 (The term "general public" in the *Staunton* definition "differentiate[s] between deposits received from sources in some way connected with the bank and those received from ordinary and unrelated customers of banking services"). Moreover, the funds so held by MoneyGram are not "repayable to the depositors on demand or at a fixed time." *See Staunton*, 120 F.2d at 934. Rather, these funds are payable to third-party payees when the checks and money orders clear through the banking system.

MoneyGram's business likewise does not involve "the use of deposit funds for secured loans." *See Staunton*, 120 F.2d at 934. The items that MoneyGram seeks to characterize as "loans" consist primarily of amounts due to MoneyGram that its agents are permitted to retain temporarily under "delayed remittance agreements." Pursuant to the MTA, the agents hold these funds not as borrowers but as "trustees" for MoneyGram under a "trust agreement." These items are classified on MoneyGram's books not as "loans," but as "accounts receivable." Whereas banks normally charge interest on their loans, MoneyGram charges no interest on these "accounts receivable" unless they are past due. And MoneyGram does not "use deposit funds" to make these supposed "loans." *See ibid.* Quite the contrary: The supposed "loans" consist of supposed "deposits" that MoneyGram's agents have not yet made.

Nor does MoneyGram possess any other characteristics that bring it "within the commonly understood definition of

a 'bank'." *See Staunton*, 120 F.2d at 934. MoneyGram is not regulated as a "bank" by the Federal Reserve Board, the OCC, or the FDIC, and it is not eligible for membership in the Federal Reserve System. Rather, it is regulated as an MSB. Federal banking regulations specifically exclude MSBs from the definition of "bank." *See* 31 C.F.R. sec. 1010.100(d)(7) (2011); *id.* sec. 103.11 (2009) (predecessor of sec. 1010.100(d)(7) in effect for the tax years at issue). MoneyGram is licensed and regulated by the States in which it does business not as a "bank" but as a "money transmitter." Check cashing services and issuers of travelers checks are not commonly understood to be "banks," and MoneyGram stands on no stronger footing in this respect.[6]

MoneyGram does not contend that it possesses the essential characteristics of a bank as that term is commonly understood. Rather, it contends that this first requirement does not exist and that section 581 requires only that an institution accept deposits, make loans, and be regulated by a banking authority. As discussed previously, this argument fails as a matter of statutory construction: It renders meaningless the principal clause of the first sentence of section 581, and the argument must be rejected for that reason.

In any event, the case on which MoneyGram principally relies—*Austin State Bank*—does not support its position. The taxpayer there was "incorporated as a bank under the laws of the State of Indiana." *Austin State Bank*, 57 T.C. at 185. The taxpayer "looked like a bank, conducted business like a bank, and believed it was a bank." *Id.* at 186. "That petitioner was a bank," we concluded, "is not open to serious question." *Id.* at 185. Because the taxpayer was plainly a "bank" in the commonly accepted sense of that term, "[t]he parties agree[d] * * * that the only part of section 581 whose application to petitioner * * * [was] doubtful" was the stat-

---

[6] The mere fact of State supervision does not transform MoneyGram into a "bank." MSBs are frequently supervised by the same State authority that regulates banks; in Idaho, for example, the Department of Finance regulates banks and money transmitters as well as collection agencies and cemeteries. *See* Idaho Code Ann. secs. 26–1101, 27–403 (2014). Being regulated by a State authority "having supervision over banking institutions" may enable MoneyGram to satisfy the third requirement of the section 581 definition. But State regulation, without more, does not make MoneyGram "a bank or trust company" as commonly understood.

ute's second requirement, namely, that "a substantial part of * * * [its] business" consist of receiving deposits and making loans. *Id.* at 186.

The Commissioner argued in *Austin State Bank* that the bank made too few loans and that it accepted too few deposits from the general public to have these activities regarded as "a substantial part" of its business. We rejected that argument and held that the bank satisfied the section 581 definition. *See* 57 T.C. at 187–188. Because we emphasized in *Austin State Bank* that the taxpayer was a "bank" and hence satisfied this part of the section 581 definition, our Opinion in that case clearly does not support the proposition that this first requirement does not exist. Rather, the reasoning and holding of *Austin State Bank* are fully consistent with the interpretation of the statute enunciated above: An entity is not "a bank or trust company incorporated and doing business" under section 581 unless it is a "bank or trust company" within the ordinary meaning of those words. *Id.* at 185.

In sum, MoneyGram is not chartered as a bank, is not regulated as a bank, and does not manifest "the bare requisites" for bank status established in *Staunton* and its progeny. Because MoneyGram does not display the essential characteristics of a bank as that term is commonly understood, and because the requirements of section 581 are conjunctive rather than disjunctive, MoneyGram is not a "bank" for purposes of section 582.

### B. *"Receiving Deposits and Making Loans"*

The conclusion that MoneyGram is not a "bank" as the term is commonly understood would suffice for us to grant respondent's motion for partial summary judgment. We will nevertheless consider, for the sake of completeness, MoneyGram's ability to satisfy the second requirement of the section 581 definition, namely, that "a substantial part" of its business consist of "receiving deposits and making loans." We find that receiving deposits and making loans do not constitute any meaningful part of MoneyGram's business, much less "a substantial part." [7]

---

[7] In most or all States MoneyGram appears to be "subject by law to supervision and examination by State * * * authority having supervision

1. *"Receiving Deposits"*

The term "deposit" for purposes of section 581 is not defined in the statute, the regulations, or the legislative history. We therefore employ the standard tools of construction to discern its meaning. The starting point is the statutory language. *Greyhound Corp. v. Mt. Hood Stages, Inc.*, 437 U.S. 322, 330 (1978). We also "consider relevant legal authority and the statute's purpose and context." *Dolan v. USPS*, 546 U.S. 481, 486 (2006); *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").

At least since *Staunton*, courts have held that business realities, rather than labels, control in determining whether a bank receives "deposits" within the meaning of section 581 and its predecessors. In *Staunton*, the entity accepted funds from the public and, as evidence thereof, issued "certificates of investment" to its customers. The Court of Appeals for the Fourth Circuit concluded that this terminology was employed to comply with Virginia regulations governing industrial loan corporations and that the funds held under these "certificates of investment" were functionally equivalent to bank deposits. *See Staunton*, 120 F.2d at 933. In *Morris Plan Bank*, 125 F.2d at 441, the entity accepted funds from the public and issued to its customers "certificates of indebtedness" that were similar to the "certificates of investment" in *Staunton*. The Court of Appeals for the Second Circuit held that the entity was a "bank" under the predecessor to section 581: "Names are not what control. * * * Realities do. * * * It issued the certificates of indebtedness in form similar to that of deposit books used by savings banks." *Ibid.*

Under this functional approach, courts have ascertained whether a bank receives "deposits" by considering the purpose for which customers transfer the funds and the terms under which the bank holds the funds. The Court of Appeals

_____

over banking institutions." *See* sec. 581. Respondent contends that MoneyGram nevertheless fails to satisfy the third requirement of section 581 because it is not regulated by any banking authority *as a bank*. Since we conclude that MoneyGram fails to satisfy the first and second requirements, we need not decide whether it meets the third requirement.

for the Fourth Circuit noted in *Staunton*, 120 F.2d at 934: "Strictly speaking the term bank implies a place for the deposit of money, as that is the most obvious purpose of such an institution. Originally the business of banking consisted only in receiving deposits, such as bullion, plate, and the like, for safe-keeping until the depositor should see fit to draw it out for use."

Courts following *Staunton* have repeatedly described "deposits" as funds that customers place in a bank for the purpose of safekeeping. *See Jackson Fin. & Thrift Co. v. Commissioner*, 260 F.2d 578, 582 (10th Cir. 1958), *rev'g* 29 T.C. 272 (1957); *Commissioner v. Valley Morris Plan*, 305 F.2d 610, 618 (9th Cir. 1962) (purchase of thrift certificates was a "deposit transaction, the money to be kept safely for the purchaser and to be repaid"); *id.* at 623 ("Depositors place their money in banks primarily for safekeeping."), *rev'g in part* 33 T.C. 720 (1960) *and* 33 T.C. 572 (1959); *Nat'l Bank of Commerce v. Commissioner*, 16 T.C. 769, 772 (1951) ("The main purpose of a deposit is safekeeping."). State courts, as well as Federal courts, have defined "deposits" in this way. *See, e.g.*, *Appeal of Metro. Life Ins. Co.*, 164 A. 715, 717 (Pa. 1932) ("The term 'depositor' must be understood in its popular sense, as one who has intrusted money to a bank for convenient safe-keeping, subject to his control.").

In *Staunton*, 120 F.2d at 933–934, the Court of Appeals described deposits as funds that are "repayable to the depositor on demand or at a fixed time." In practice, banks generally hold "deposits" for extended periods:

> In the commercial banking industry, deposit relationships represent the most favorable source of funds * * * . Since the ability of a bank to attract and retain core deposits is the main factor in the size and scope of its business, most banking services are designed to keep and develop those deposit relationships. Once a deposit relationship is established, it generally will be retained, all things being equal, for a period of time with little, if any, need for the bank to engage in further direct marketing efforts. * * * [*AmSouth Bancorp. & Subs. v. United States*, 681 F. Supp. 698, 705 (N.D. Ala. 1988).]

*See also S. Bancorporation, Inc. v. Commissioner*, 847 F.2d 131 (4th Cir. 1988), *aff'g* T.C. Memo. 1986–601.

The first definition of "deposit" in many dictionaries is "something placed or entrusted for safekeeping, specif., money put in a bank." *E.g.*, Webster's New World Dictionary

379 (2d coll. ed. 1980). "On deposit" means "placed or entrusted for safekeeping." *Ibid.*; American Heritage Dictionary 487 (5th ed. 2011) (defining "deposit" as a verb to mean "[t]o give over or entrust for safe keeping" or "[t]o put (money) in a bank or financial account"). In its broadest sense, "deposit" can mean "something deposited or left lying," like mineral deposits or volcanic ash. Webster's New World Dictionary 379. But construing statutory language is not "an exercise in ascertaining 'the outer limits of [a word's] definitional possibilities.'" *FCC v. AT&T Inc.*, 562 U.S. 397, 407 (2011) (quoting *Dolan*, 546 U.S. at 486). The significance of a word is derived from its unambiguous meaning in its context, notwithstanding its susceptibility to alternative meanings in other contexts. *See Carcieri v. Salazar*, 555 U.S. 379, 391 (2009). As used in section 581, the term "deposits" plainly refers to deposits of the sort received by banks; it thus has a specific meaning narrower than its broadest reach. *See Commissioner v. Valley Morris Plan*, 305 F.2d at 616 (the term "deposit" has always had "a meaning of its own, peculiar to the banking business").

The funds that MoneyGram seeks to characterize as "deposits" are funds that it receives from its agents and financial institution customers, which it invests temporarily until money orders and official checks clear through the banking system. MoneyGram's public financial statements do not describe these funds as "deposits"; rather, these amounts are shown on its books as "payment service obligations." Until 2008 MoneyGram on its Federal tax returns described its business as "nondepository credit intermediation," thereby representing that it does not receive deposits. The forms completed by MoneyGram's money order customers explicitly state that MoneyGram is not receiving "deposits." As an MSB, MoneyGram is prohibited by law from receiving actual "deposits." *See* 12 U.S.C. sec. 378 (2006).

Nor do the funds that MoneyGram receives display the essential features of bank deposits. Customers do not place funds with MoneyGram for safe keeping, nor does MoneyGram hold its customers' funds for extended periods of time as part of its capital structure. Quite the contrary: MoneyGram's customers expect that it will transmit the funds to the payee instantaneously (in the case of money transfers) or the moment the payee presents the instrument

for payment (in the case of money orders). Except in rare cases of escheat, money orders typically remain outstanding for fewer than ten days. MoneyGram has brought to our attention no bank whose "deposits" turn over this rapidly. *See Safe Deposit & Trust Co. of Balt.*, 121 F.2d at 985 (concluding that funds held by trust company as fiscal agent for favored corporations "were clearly not the ordinary commercial deposits which banks receive"). [8]

The same analysis applies to MoneyGram's "official check" services. Banks provide funds to MoneyGram for the processing of official checks, not for safekeeping. To open an account, a "bank must provide to MoneyGram funds equivalent to the amount of the official checks it estimates it will issue on an average daily basis." After making its initial settlement report, the bank must provide to MoneyGram "the amount of the official checks it issued the previous day." This daily process of drawing down and replenishing the account continues indefinitely for the life of the agreement between MoneyGram and its customer. MoneyGram accepts these funds, not to satisfy its customers' need to protect their own money from risk of loss, but to protect itself from risk of loss in the event its customer should default or delay in payment. This account is essentially a short-term holding tank for funds in transit, and the funds in it are not "bank deposits" in any sense of the word. [9]

MoneyGram's business consists of moving its customers' money from point A to point B as quickly as possible. The funds it holds pending completion of that service are not

_____

[8] When a customer cancels a transaction or the payee delays in presenting the instrument for payment, MoneyGram may end up holding its customers' funds longer than expected. But people patronize MoneyGram to move money, not to hold it. The fact that the service offered by MoneyGram sometimes is not completed, or has its completion date deferred, does not transform the service into the receipt of a bank deposit.

[9] *Cf. State ex rel. Meyer v. Am. Comty. Stores Corp.*, 228 N.W.2d 299, 303 (Neb. 1975) (for purposes of State law making it illegal for a nonbank to receive deposits, an entity engaged only in the electronic transfer of funds was "not engaging in either a banking or savings and loan business"); *Appeal of Metro. Life Ins., Co.*, 164 A. at 717 (for purposes of State insolvency law guaranteeing preferential payment of "deposits," trust company holding mortgage collections as agent for its principal held a "running account of the collections made * * * [that had] none of the ordinary incidents of a deposit").

placed with it for safekeeping and are not held for any meaningful period of time. Its money order customers are explicitly told that they are not making "deposits," and these funds are reflected on its financial statements not as "deposits" but as "payment service obligations." Because "receiving deposits" does not constitute any meaningful part, much less "a substantial part," of MoneyGram's business, it does not qualify as a "bank" under section 581.

### 2. "*Making Loans*"

In order to satisfy the second requirement of the section 581 definition, "a substantial part" of the institution's business must consist not only of "receiving deposits" but also of "making loans." As with the term "deposits," we interpret the term "loans" according to the ordinary meaning of that word. We also consider relevant legal authority and the statute's purpose and context. *Dolan*, 546 U.S. at 486.

A "loan" is defined as "a sum of money lent at interest." Black's Law Dictionary 1077–1078 (10th ed. 2014). Given the context in which the phrase "making loans" appears, a "loan" for purposes of section 581 must be made in a form similar to that of a bank loan. A bank loan is memorialized by a loan instrument, is repayable with interest, and generally has a fixed (and often lengthy) repayment period. *See, e.g.*, 11 C.F.R. sec. 100.82 (2008) ("bank loan" to a political candidate or committee does not constitute a political contribution if it is made in the ordinary course of business, "[b]ears the usual and customary interest rate," assures repayment, is evidenced "by a written instrument," and is "subject to a due date or amortization schedule").

In *Staunton*, 120 F.2d at 931, the entity was an "industrial loan corporation" that made "loans to any one having acceptable credit or collateral." Its loans were evidenced by printed forms of notes signed by the borrower, and the loans were repaid by the borrower in regular installments. The institution derived its income exclusively from interest charged on these loans. The Court of Appeals concluded that the company was a "bank" because (among other things) it lent money to third parties on terms consistent with the common understanding of "bank loans." *Id.* at 930, 933.

The items that MoneyGram seeks to characterize as "loans" consist primarily of amounts due MoneyGram that its

agents are permitted to retain temporarily under "delayed remittance agreements." Under these agreements, the agents typically forward to MoneyGram, twice weekly rather than daily, the cash that agents receive from money order customers. The MTA that implements these agreements classifies the agents holding funds for transmission to MoneyGram as "trustees," not as borrowers. These items are classified on MoneyGram's books not as "loans" but as "accounts receivable." And whereas banks invariably charge interest on their loans, MoneyGram does not charge interest on these accounts receivable except in the unusual circumstance where the account is past due.

Most corporations have, among the assets on their balance sheet, accounts receivable from customers, agents, and other persons. Any company having accounts receivable must specify the period within which it expects its customers to pay such accounts. Some invoices may say that they are payable immediately upon receipt; other invoices may afford the customer 30 days to pay. MoneyGram's "deferred remittance agreements" simply specify the period—generally, half a week—within which its agents are expected to transmit to MoneyGram the sums they owe MoneyGram. These agreements do not give rise to "loans" within the meaning of section 581, any more than garden variety payment terms specified by any business give rise to "loans." Were that not so, any company that has accounts receivable on its balance sheet could plausibly contend that it satisfies this requirement for "bank" status.

We conclude that MoneyGram's "accounts receivable" do not constitute "loans" within the meaning of section 581. The supposed loans are an inevitable consequence of MoneyGram's business model: Its agents accept cash from customers and pay that cash to MoneyGram several days later as previously agreed. This pattern is not unique to MoneyGram but is the pervasive pattern for all businesses that sell goods or services and receive deferred payment.

C. *Petitioner's Arguments*

MoneyGram cites "policy considerations" as support for its submission that it should be allowed bad debt deductions for its securities losses. According to MoneyGram, section 582 "recognizes that certain institutions hold securities not for

speculation or profit but because of government regulation and as part of their ordinary course of doing business." MoneyGram notes that State regulators require it to hold highly rated securities to protect its customers and that it was forced to sell its non-REMIC asset-backed securities to ensure continued compliance with regulatory mandates. Because it incurred these losses in the ordinary course of its business, MoneyGram insists that ordinary loss deductions should follow.

The question before us is not whether the rule petitioner advocates reflects sound policy but whether Congress enacted petitioner's preferred rule. The answer to the latter question is certainly "no." Many businesses may plausibly contend that they incur investment losses in the ordinary course of their business. But Congress has determined that such losses can give rise to bad debt deductions under section 166(a) only if the business in question is a "bank."

The legislative history shows that Congress acted deliberately in limiting the benefits of section 582 to "banks" as opposed to other financial institutions. When enacting the predecessor statute in 1942, Congress explicitly stated that it intended to limit bad debt deductions for securities losses to "banks," to the exclusion of life insurance companies, which had argued for similar treatment. *See* H.R. Conf. Rept. No. 77–2586, at 45 (1942), 1942–2 C.B. 701, 708. MoneyGram has offered no policy rationale why MSBs should enjoy better treatment than life insurance companies. And even if MoneyGram could enunciate such a rationale, we are bound by the language of the statute that Congress actually enacted. *See Commissioner v. Lundy*, 516 U.S. 235, 252 (1996); *Iselin v. United States*, 270 U.S. 245, 250–251 (1926); *Eanes v. Commissioner*, 85 T.C. 168, 171 (1985).

### D. *Conclusion*

MoneyGram does not possess the essential characteristics of a "bank" as that term is commonly understood, and it does not have as a substantial part of its business "receiving deposits" or "making loans." MoneyGram is not regulated as a bank or regarded as a bank by any Federal or State bank regulator. MoneyGram is a "money services business." As a consequence of the services it provides, it holds amounts due from its agents as accounts receivable, and it places in tem-

porary investments the funds corresponding to its payment service obligations. Innumerable MSBs and other financial institutions act similarly, but this does not make them "banks."

We think it absolutely clear that Congress never intended an institution such as MoneyGram to qualify as a "bank" within the meaning of section 581. Because MoneyGram during 2007 and 2008 was not a "bank," it was ineligible to claim bad debt deductions on account of the partial or complete worthlessness of its non-REMIC asset-backed securities. We will therefore grant respondent's motion for partial summary judgment and deny petitioner's motion.

In consideration of the foregoing,

*An appropriate order will be issued.*